OTHAR K. JENSEN et al., Appellants, v. SAWYER STATE BANK, Respondent, and H. THORSON and T. D. Thorson, Interveners and Respondents.

(173 N. W. 162.)

**Banks and banking — execution of notes for bank — responsibility.**

1. Where, in order to raise moneys for banking operations, an arrangement is made, pursuant to an agreement of the officers and directors of a bank, to deed certain lands then held by the bank to its cashier, and for the cashier then to mortgage such lands to secure two notes for $4,500 each, to be signed by the directors thereof, and where, pursuant to such agreement, such deed, notes, and mortgages are executed and $9,000 secured thereby through a sale of such notes and mortgages, and where, thereupon, such proceeds are paid to the bank and credited to its real estate or loans and discounts account, representing real estate held, and the lands involved are thereafter treated, in making sales, in raising crops, in payment of taxes, and in rentals thereof, as the lands of the bank, and it was so understood between all the bank officials and directors, even though, on the books of the bank, the specific liability therefor is not shown in the usual form, and where such cashier, after ceasing to be such, deeded the lands involved to his successor, it is *held* that the bank is legally

44 N. D.—15.

liable to the parties who assumed and executed such notes, for the amount of moneys paid by them, upon such obligation so assumed, for the interest and purposes of the bank.

**Banks and banking — execution of notes for bank — responsibility.**

2. Where, subsequent to such agreement and its consummation, ninety-five shares of the stock of such bank are sold to persons not parties to such arrangement, at about 50 per cent of the par value of such stock, and where such parties, so purchasing, examined such bank and its condition prior to such purchase, and relied in part upon the judgment of its then cashier, who knew all about this transaction, and who theretofore had received and retained a deed to the lands involved from its former cashier, and where, in addition, one certain piece of real estate so deeded is directly carried in the real estate account of such bank as owned and possessed by such bank, all of which furnished a means and an opportunity of knowing and understanding the real nature of this transaction concerning the real estate, it is *held* that such persons are not innocent purchasers of such stock so as to create an estoppel against the persons who assumed such obligation, in an action thereupon against the bank, even though such obligation is not evidenced upon the books of the bank in the usual form.

**Appeal and error — trial by court — review.**

3. Where an action properly triable under the Newman Act is tried by the court as a law case, with the consent of the respondent, this court will consider and review the same as a law case, where in so doing it is without prejudice to the rights of the appellant.

Opinion filed May 2, 1919.   Addendum filed May 22, 1919.

Action to recover upon notes executed and paid, for the benefit of the defendant bank. From a judgment rendered for the defendants and interveners dismissing the action, and, from an order denying a new trial, in the District Court of Ward County, *Leighton,* J., the plaintiffs appeal.

Judgment reversed, with directions to enter judgment for the plaintiffs.

*W. S. Lauder,* for appellants.

*Engerud, Holt, & Frame,* and *John E. Greene, Palda, Aaker, & Greene,* for defendant, interveners, and respondents.

BRONSON, J. (upon reargument). This action was reargued before

the entire court on March 8, 1919. The prior hearing before this court occurred on September 24, 1917, and a decision affirming the judgment of the trial court was rendered by this court just prior to December 1, 1918. This action was brought to recover $9,807.45 against the defendant bank by reason of certain notes executed in a real estate transaction. The interveners, who are subsequent stockholders of the bank, interposed a complaint in intervention, alleging an estoppel and praying for a dismissal of plaintiffs' causes of action. The action was tried in the trial court as a law case without a jury, and judgment was rendered, pursuant to findings of the trial court, for the dismissal of plaintiffs' complaint.

From such judgment, and from an order of the trial court denying a new trial, the plaintiffs have appealed. The contentions of the parties have been ably presented before this court in briefs, supplemental briefs, and by elaborate arguments, orally made by the learned counsel upon the reargument. No attempt will be made to discuss in detail all the features of the evidence presented in the record. Some of the leading facts will be stated, sufficient to base an understanding upon the principles of law made applicable to the record facts by this opinion. These facts are stated as follows: The defendant is a state bank located at Sawyer, North Dakota. Its capital stock is and was $16,000. In the fall of 1912 the bank had become possessed of considerable real estate in the course of its banking operations, having procured the same through foreclosure sales or otherwise upon obligations due the bank. Accordingly, in the month of November, 1912, it had some 1,300 acres or more of lands situated in Ward county. On its books the moneys loaned or invested in such lands were represented in the real estate account, or in the loans and discounts account, in the form of bills receivable. The real estate account then showed something over $5,000 invested in real estate, and at this same time the loans and discounts account was carrying in the form of bills receivable considerable amounts of moneys invested by the bank in real estate, but not carried as such in the real estate account. At that time the plaintiff Jensen was cashier of such bank; the plaintiff Atkinson, assistant cashier; the plaintiffs Saastad, Hays, and Atkinson, and also one Rosholt, were directors thereof. Jensen, although cashier, had, in

fact, no stock. The other persons mentioned owned the great majority of the stock of such bank. During the month of November, 1912, meetings of the officers and directors, as well as of the stockholders, were held with reference to securing moneys to carry on the operations of the bank. Plans were discussed of levying an assessment or of using these lands as a means whereby some moneys might be raised, as well as to lessen the real estate holdings. There was no disagreement that either one of these two plans had to be adopted or the bank must borrow money as banks usually do. As a result of these meetings a plan was adopted whereby these lands were deeded by the bank to its cashier, Jensen, who thereupon, with his wife, executed two notes each for $4,500, dated December 1, 1912, and due in two years, payable to said Atkinson, a director, and, to secure the same, also executed separate mortgages for each of said notes on these lands. Then the directors, Atkinson, Hays, and Saastad, each as individuals, indorsed these notes so executed, and the same, together with the mortgages securing such notes, were sold to two other banks, and $9,000 in moneys secured. This money, so received, was paid to the bank; some $3,800 thereupon being placed to the credit of the real estate account which reduced such real estate account down to some $1,600, and the balance being placed in the loans and discounts account in reduction of certain bills receivable evidencing investments in such real estate. About January 15, 1913, Jensen ceased to be cashier, and one Bowman succeeded him. After this deal was so made the bank paid interest on these two notes so sold to other banks. For instance, it paid $319 interest on February 10, 1914; it paid $107.50 interest on June 8, 1914; it thereafter made payments on the first mortgages; it paid taxes; it paid for repairs on the premises; it leased or cropped the lands and received the returns thereupon. No control over the land or payments of any kind on the notes were made by the plaintiffs, excepting the final payments made, which are the subject of this action. Some of these payments for interest, repairs, and taxes were directly charged up in the real estate account of the bank. The bank sold one-quarter section of the land so deeded. It received two notes aggregating $894, which it credited on February 14, 1914, to the real estate account, charging such notes in the bills receivable account. It ob-

tained a deed from Jensen for such land. Another piece of such lands was traded by the bank for some other land, and the sum of $217 paid as excess or "boot" money. The bank received a deed for this land. No money was paid by or to Jensen on account of these transactions. Jensen also executed a deed on these lands to said Bowman, the cashier, and the title to the lands has ever since remained in Bowman of record. In the year 1914 negotiations were begun between one Rosholt who was principally interested in such bank, with one Thorson, to purchase the controlling interest in such bank, and thereafter, in the spring and summer of 1914, pursuant to such negotiations, said Thorson and his son became possessed of ninety-five shares of stock in such bank. For this stock he paid 50 per cent of its par value. The elder Thorson has eighty-five shares, his son ten shares procured through his father. The purchase of stock began in March, 1914, thus: Thorson bought five shares from Dr. Herbst in March, 1914; thirty shares from Rosholt in April, 1914; ten shares from Hays in April or May, 1914, and the balance during the spring and summer of that year. Mr. Ingwaldson had done work of auditing in banks for the elder Thorson; he was directed by Thorson to ascertain the condition of this bank. During the latter part of February, 1914, Ingwaldson visited the bank and made an examination. He testified that he looked over the daily statement, the certificate register, glanced over the other real estate account and noticed that it was nearly $8,000; that he asked what they had in that; that he examined the bills receivable and the notes and securities. That he made no examination as to what particular real estate the bank owned at that time; that he was advised that it was farm lands and a couple of lots in town. That he was informed of no notes or mortgages that had been taken for the sale of land to Jensen that he could remember. That he talked to Mr. Bowman, the cashier. The other real estate account at that time as shown in the evidence disclosed payments of interest on mortgages, and repairs or expenses charged concerning some of these lands that had been theretofore deeded to Jensen. Bowman, during these negotiations, was the cashier, and corresponded to some extent with the elder Thorson concerning the purchase, the payment, and delivery of bank stock to Thorson. The elder Thorson, as a witness, testified, in one place in his

evidence, that he knew Bowman before he purchased the stock, that
he knew he had been in the bank a year or more as cashier, that he
relied to some extent on Mr. Bowman's judgment as to whether the
stock would be a good purchase.  At another place he testified that in
purchasing the stock from Mr. Hays, Mr. Bowman acted for him in
the transaction; that he directed Bowman to buy it, and sent him the
money to buy.  That he had no communication at any time with Mr.
Hays.  Bowman, the cashier, bought his stock, thirty shares, in Jan-
uary, 1913, paying $3,000 for the same, par value, and at that time
he knew all about this land transaction with Jensen.  In May, 1914,
an assessment of 50 per cent on the bank stock was levied and there-
after paid.  After the purchase of such stock by said Thorson the
bank continued to handle such real estate and to look after the same,
paying the taxes, some interest on mortgages, and repairs upon the
same; many of these items appeared in the real estate account until
August, 1914, when the real estate account then amounting to over
$11,000, a new account was instituted, termed the Rosholt et al. ac-
count.  To the new account, thereafter items of disbursements and
receipts concerning these lands were charged, and some items from
the real estate account were transferred.

Subsequently each of these $4,500 notes became due and went to
protest, the bank refusing to pay them.  These plaintiffs paid them,
and, upon the refusal of the bank to recompense them, thereupon in-
stituted this action.  It is the contention and claim of the plaintiffs,
in substance, that this plan, so carried out, was done for and by the
bank, and for its benefit; that it was understood and agreed that the
real estate so deeded to Jensen, all of the time, should be considered
and regarded as the real estate of the bank, and that out of the proceeds
to be realized from these lands that might be sold the notes should be
paid, and if they could not so be paid when the notes fell due, then
the bank should make payment of the same.  The bank and the in-
terveners herein, on the other hand, contend this transaction was a sale
of the lands to Jensen; that the records of the bank so show; that noth-
ing on the books of the bank show to the contrary; that furthermore
these interveners purchased the stock in the bank, without knowledge
of this secret agreement or plan, and that the plaintiffs herein are

estopped to assert any claim against them or the bank by reason thereof. From the record in this case it plainly appears that this transaction was had for the purpose of securing money for the bank, and for the purpose of relieving the bank of the situation then presented. That it was put through in the name of the cashier, Mr. Jensen, and the directors, as a means of accomplishing this purpose, with the thought in mind that the bank could work out, through this plan, by disposition of the lands before the notes came due. The immediate parties to this arrangement do not at all disagree in this record concerning this intent and purpose. It is true that the reports made to the bank examiner and the books of the bank thereafter do not contain any statement or record of any such agreement. It is to be noted, however, that subsequent statements made to the bank examiner,. however, listed 80 acres of these very lands deeded to Jensen in its real estate account of lands owned by the bank. As between original parties to this plan or agreement, we are satisfied upon the record that the deed of these lands was made to Jensen, not for the purpose of a bona fide sale to him of such lands, or with any intent or thought on his part of purchasing the land, but that the deal was made bona fide between the original parties in the bank for the purpose of assessing and aiding the bank in repleting its capital, lessening its real estate, and putting it in shape as a bank to continue its operations, without levying an assessment upon the capital stock. The subsequent action of the bank in treating this real estate as its own simply confirms this conclusion.

Every item of money realized from the sale of any of these lands involved, or from rentals or crops produced thereupon, was received by the bank. Every item of disbursement concerning these lands has been made by the bank. Every action therefor of the bank and every action of the plaintiffs herein simply corroborates the intent and purpose for which this deed was given and the manner in which these lands belonging to the bank were, in fact, used as a basis of securing money. The principal contentions raised on this appeal between the parties, pursuant to the specifications and the issues presented thereby, are as follows:

(1) Whether this action was properly tried as a law case or was properly triable under the Newman Act.

(2) Whether the bank was liable to the plaintiffs for the obligations assumed and paid by them.

(3) Whether the plaintiffs are estopped as against the bank and the interveners, subsequent purchasers of the stock of such bank.

The trial court, in its findings and conclusions, finds in substance that this obligation assumed and paid by the plaintiffs was secretly made; that it is not shown upon the books or records of the bank; that it was fraudulently and secretly withheld, and not disclosed to the interveners, subsequent purchasers of the stock of the bank; that by reason of such fraudulent concealment the plaintiffs are estopped to assert a claim against the bank.

The action in the trial court was tried as a law case to the court, a jury being waived by the defendant and interveners. The complaint in the action seeks an accounting and asks for equitable relief. The answer of the defendant bank sets up grounds of estoppel, as does likewise the complaint in intervention. Properly the action might have been tried as an equitable action under the Newman Act; but in view of the conclusion to which this court has arrived in the decision of this case, and in view of the fact that the respondents consented to, and do not complain against, the trial and determination of this action as a law case, this contention of the appellants becomes immaterial, because not prejudicial.

Our next consideration is addressed to the liability of the bank upon this obligation of the plaintiffs so assumed and paid, in view of the record facts herein, that no formal action of the board of directors, or of the stockholders of the bank, anywhere appears recognizing the same as an obligation of the bank, and that, furthermore, in the books and records of the bank there does not appear any direct recognition of such obligation.

It is clear, from the record, that Jensen, as well as the other officers of the bank, in the fall of 1912, possessed authority to borrow money for purposes of the bank. There is nothing in the record which inhibited borrowing $9,000 for bank purposes, and to pledge security therefor. Consequently, if Jensen or the other officers of the bank had borrowed $9,000, and given these very notes signed by the bank, and had put up these lands as collateral security to secure such notes,

the bank unquestionably would have been liable therefor, and, likewise, unquestionably the records of the bank would have shown in its bills payable the amount so borrowed. By means of the arrangement and plan pursued the $9,000 in question was secured by these same officers for the very purposes that a loan for that amount would have subserved. The money secured went directly to the bank. The $9,000 so secured was not credited as bills payable; it did show as a credit in the loans and discounts account, and, as a credit to the real estate account, with a corresponding and apparent diminution in the real estate holdings offsetting such amount. As a matter of debit and credit, the bank would be in exactly the same position no matter whether it borrowed the $9,000 direct, or whether it borrowed it through the plaintiffs. However, as a matter of conforming to bank examinations and reports to be made, and with reference to amount of real estate shown to be carried, it did make a considerable difference concerning the apparent liquid assets of such bank and its ability to do banking business. If the equity of the bank in the land so deeded was, in fact, actually worth $9,000, the actual value of the stock, as a matter of debit and credit, did not improve or increase by making this deal, no matter whether it be considered a loan or a sale. If, then, there was the necessity for an assessment upon the stock to replete impaired capital, it was just as necessary in fact after these notes were given as it was before. Accordingly we are clearly of the opinion that, as far as the bank and the original stockholders are concerned, this obligation which its cashier and others assumed for the bank was a bank obligation enforceable against the bank. First Nat. Bank v. State Bank, 15 N. D. 594, 109 N. W. 61; Rankin v. City Nat. Bank, 208 U. S. 541, 52 L. ed. 610, 28 Sup. Ct. Rep. 346; 7 C. J. 559, § 166; Flower v. Commercial Trust Co. 138 C. C. A. 580, 223 Fed. 318.

The respondents, however, strenuously contend that, upon principles of estoppel, even though no bona fide sale of the land was made, the plaintiffs cannot maintain this action. They assert, among other things, that the interveners, who subsequently purchased ninety-five shares of the stock, had no notice of this secret arrangement or obligation when they bought the stock, and that the interveners purchased

such stock only with notice of liabilities of the bank to the extent that its books then showed. It is quite apparent that this contention cannot be maintained to its full extent under all circumstances; for instance, if at the time this stock was transferred to the interveners the bank then owned a drayage bill of $50, or a bill for attorneys' fees for $100, or an obligation for rent for $200, or some similar item not then shown on the books of the bank for which the bill had not been rendered, surely the bank in such instance would be liable for such indebtedness. The principle issues presented, and the one demanding our serious consideration, is whether, under the circumstances, there was such a concealment of the real transaction and such a lack of knowledge of the part of the interveners concerning this transaction when they purchased the stock, so as to raise an estoppel against the plaintiffs to maintain this action. This is a serious question in this case, and it is not free from difficulties. Ordinarily the commercial activities of a bank and its formal actions should be and are required to be noted either in its records or in its books. Secret and clandestine agreements which serve to create an apparent financial banking condition of a bank, and which serve to mislead the public, either depositors or prospective stockholders, should and ought to create an estoppel as against parties who seek afterwards to enforce such secret arrangements. The main question, therefore, is whether, within this record, there appear facts and circumstances which gave or may have given to the interveners at the time this stock was purchased notice of this arrangement and necessarily of this obligation.

The interveners are father and son. The elder Thorson has had a banking experience extending over forty years. At the time he was interested in twenty-two banks. He had an auditor who examined banks for him and who did examine the condition of this bank. This bank, at the time of the purchase of the stock, was in financial trouble. The elder Thorson knew this. He bought this stock, nearly all of it, at 50 per cent of the par value thereof. The books and records of the bank at the time Thorson caused it to be investigated disclosed at least that the bank was looking after this real estate involved, was renting the same, and had negotiated concerning a sale of some of these very lands. Thorson testified that he relied to some extent on Bow-

man's judgment concerning this purchase of stock, as to whether it would be a good purchase. Bowman was then the cashier of the bank.

There is in the evidence, exhibit 2, a carbon copy of the letter dated March 6, 1914, from Bowman to the elder Thorson, which states that there is inclosed a statement of the real estate held by the bank. This statement tells a big tale in itself. It contains the very lands that were deeded to Jensen. It contains a purported statement of the value of such lands, and a list of the amounts that were credited to each of such pieces of land so deeded out of the $9,000 received on the notes. It also contains a list of the first mortgages against such lands, and arrives at a tentative balance of the value of the lands as against the amount of encumbrances or investments therein. If Thorson received this statement there would be absolutely no question about his notice of this transaction in connection with these lands. The record is in dispute concerning whether Thornson did get this statement. Thorson denies having received the same, and Bowman does not testify that the original letter, with the statement inclosed, was sent to Thorson; but he testifies that he does not remember, but, regardless of this question, Bowman knew about this deal. He must have prepared this statement for Thorson; and, if Thorson relied on Bowman's judgment concerning the purchase of the stock, he knew about this transaction if Bowman acted bona fide. There is nothing in the records to justify the inference that the plaintiffs were guilty of any fraudulent concealment as far as the directors or stockholders of the corporation were concerned. The earmarks of this transaction were apparent upon the face of the records of the bank, although the transaction was not carried in the usual manner as a bills payable account, for reasons that are apparent owing to the condition of the bank. Nevertheless, the bank, by its conduct, by its records, by its control over these lands, disclosed, and its records showed, the real motive of this transaction. There, therefore, is no legal reason why the ordinary rule applicable to purchasers of stock in a corporation should not apply, in other words, Thorson bought this stock subject to equities existing against the bank that might affect the value of such stock as far as this transaction was concerned. Comp. Laws 1913, § 5160. Under the circumstances the fact that the reports made to the bank

examiner did not disclose this arrangement, or that the interveners may have relied in part thereupon in the purchase of the stock, does not create any estoppel against the plaintiffs in this action, in view of the accommodation service rendered by the plaintiffs to the bank and the knowledge thereof ascertainable from the books and records of the bank. Leonard v. State Exch. Bank, 149 C. C. A. 448, 236 Fed. 316, this is an action on the obligation assumed against the bank. It is not an action involving the rights of the interveners, if any, to recover for false representations and deceit in the sale of the stock to them, similar to that in Gerner v. Mosher, 58 Neb. 135, 46 L.R.A. 244, 78 N. W. 384.

Concerning this matter, in the former opinion, it is stated that "notice that a bank has assets in the shape of land is certainly not, in itself, notice that there are secret claims against the bank on account of the land, there being nothing to that effect on the books of the bank or in the public records." A careful investigation of the record discloses, in answer to that statement, that the books and records of the bank showed, both prior and subsequent to this transaction involved, that the bank not only considered this real estate as its own, but also paid the interest on this very obligation which is the subject of the suit involved herein, as well as interest on other prior liens on said lands so involved. If the bank claimed these lands as its own; or its records disclosed a course of conduct treating the same as its own, surely any purchaser of the stock, if he relied on what the books showed concerning these lands as being real estate, would be bound by the liens then existing against the same as well as the liens that then appeared of record against the same.

The record does not justify the inference that a banker of some forty years' experience owning some twenty-two banks, employing an expert auditor to examine the bank, and who did examine this bank, was not put upon inquiry, and did not have notice of this transaction, the earmarks of which are plain and apparent upon the books of the bank themselves, both before and after he purchased his stock. It therefore follows that the trial court erred in its findings and conclusions of law. The judgment of the trial court is reversed, with direc-

tions to enter judgment for the plaintiffs for the sum of $9,807.45, with interest and costs, including costs of this appeal.

ROBINSON and GRACE, JJ., concur.

BRONSON, J. (addendum). As this case has been pending before this court a great length of time, and as it has been argued and reargued before this court, and the majority opinion now reverses the former opinion rendered by this court, it is well to note a consideration or two that should be applied to the dissenting opinion now filed.

The dissenting opinion overlooks entirely that this action was tried as a law action, with the respondent consenting and not objecting thereto, and with the appellant making specific objection; accordingly this case should be governed by legal principles applicable.

The dissenting opinion apparently has discovered a new method of re-establishing impaired capital; it might be termed the "boot strap" method. In other words, impaired capital may be restored by taking $9,000 of the assets of the bank and hypothecating or disposing of the same and receiving therefor $9,000 in cash, and, presto-change, the capital is restored. The illustration cited sufficiently answers such a contention that the procedure contemplated between the parties was a re-establishment of the impaired capital. It matters not whether the transaction be termed an attempt to restore impaired capital or to make loan, in either event the status of the bank, as a matter of debit and credit, was just the same after the transaction was consummated as it was before. Simple principles of arithmetic demonstrate this. In the dissenting opinion, there is expressed alarm that the security is not disposed of by this court, when as a matter of fact the bank or its banking officials have had this property, or the control over it, for years. The bank can easily take care of this real estate and handle it without any order from this court so to do.

GRACE and ROBINSON, JJ., concur.

BIRDZELL, J. (dissenting). The opinion of the majority in this case, in my judgment, ignores both sound principles of public policy

which have long been incorporated in legislative acts, and well-established, controlling legal doctrines. After a strained interpretation of some of the facts, a conclusion is drawn therefrom that seems to me to be wholly unwarranted when the case is carefully examined even in the light of the facts stated,—much less is it warranted if the whole record is considered. The opinion seems to ignore altogether the fact that the capital of the bank was impaired prior to the negotiation of the loan that is the basis for this action, and that the whole transaction was nothing more or less than an arrangement to make good the impaired capital. The following statement from the majority opinion reflects the erroneous viewpoint. It is said: "It is clear, from the record, that Jensen, as well as the other officers of the bank, in the fall of 1912, possessed authority to borrow money for purposes of the bank. There is nothing in the record which inhibited borrowing $9,000 for bank purposes, and to pledge security therefor. Consequently, if Jensen or the other officers of the bank had borrowed $9,000, and given these very notes signed by the bank, and had put these lands as collateral security to secure such notes, the bank unquestionably would have been liable therefor, and likewise unquestionably the records of the bank would have shown in its bills payable the amount so borrowed." To this it might well be added, *likewise, unquestionably, a bank examiner performing his sworn duty would have soon closed the doors of the bank.* The fact ignored is that the bank was so heavily overloaded with real estate and bad paper that it had no right to continue to transact the business for which it was organized, without making good the impairment of its capital, *and this was recognized by its own officers.* The record shows clearly that the whole transaction, whereby the bank was to be relieved of its surplus prohibited investment of bank capital, was designed as a substitute for an assessment to make good the impairment. By ignoring these facts, the majority reach a conclusion that would be absurd if rendered in the light of all the facts. Though not appearing to do so, it holds the corporation liable for obligations of stockholders to contribute to the capital fund. On the record in this court, when all the facts are considered, this is the real conclusion, and it cannot be escaped by ignoring a portion of the facts.

There are some stubborn facts in this record, which are not men-

tioned by the majority, that should absolutely preclude recovery by the plaintiffs in this action. The statement of condition rendered on September 4, 1912, before the $9,000 was put in, showed an investment in other real estate of $5,538.81, with a further item of expense over profits of $1,325.45. The statement for November 26, 1912, shows only $1,604.23 in the other real estate account. Subsequent statements show that this account kept increasing, and the testimony of the cashier, given upon the trial from the general ledger account, shows that on March 6, 1914, the account had crept up to $8,503.43. And it further shows that this represented an accumulation of land that the bank had taken on during the period following November, 1912. Other testimony of one of the plaintiffs herein shows that in 1912, before the loan in question was made, the bank actually had more of its capital tied up in real estate than was shown on the books; for it appears that the true condition was concealed from the examiner by carrying some of the real estate as bills receivable.

The testimony of the plaintiffs themselves shows that they did not treat this transaction as an ordinary negotiation of a loan by the bank. Plaintiff Atkinson testified: "We had to use the land as a means for raising *capital;*" and, further, that there were three alternatives open to the bank: (1) To levy an assessment; (2) to borrow money as banks usually do; or (3) use the real estate as security for capital borrowed by the stockholders. It further appears that the bank, at that time, was already indebted to the First National Bank of St. Paul for borrowed money to the extent of $10,000, which indebtedness was carried in the bills payable account. The record leaves no room to doubt that the third alternative was the one chosen as to the $9,000 loan.

There can be no question, on the record as a whole, that the purpose of these very plaintiffs in conducting the transaction as they did was to utilize their personal credit, supported by collateral drawn from the excessive real estate holdings, as a means of raising money to meet their own continuing obligations to keep the capital of the bank unimpaired. It is alleged by the plaintiffs that the lands pledged as security for the $9,000 were alone worth between $15,000 and $20,000, and that "the loan was negotiated to raise money necessary to enable

said bank to continue in business as a banking institution, and to pay its depositors and other creditors and save them from loss."

The proceeds of the loan, as shown by the undisputed testimony of the cashier of the bank, were used as follows:

### Bills Receivable Credits.

| | |
|---|---|
| Note, Emily Seibold .......................... | $1,390.00 |
| Note, Fred Seibold .......................... | 1,390.00 |
| Note, Fred Seibold .......................... | 315.00 |
| Note, A. J. Vik and wife ...................... | 958.86 |
| Note, Jacob Kennewischer ...................... | 1,076.00 |
| | |
| Total proceeds of loan expended to replace capital lost through bad loans ........................ | $5,129.86 |
| Credited to real estate account (to reduce investment of capital therein) ........................... | 3,810.14 |
| | |
| Total ............................... | $9,000.00 |

Yet the majority of the court persists in treating this transaction as an ordinary loan by the bank to secure needed capital to transact its business. They seem to ignore the legal requirements that make it necessary for stockholders in banking corporations to keep the capital unimpaired as a condition of being allowed to transact a banking business. In the face of this showing of the manner in which the proceeds of the loan were absorbed in replacing the questionable assets of the bank, I am utterly unable to understand how the transaction can be treated as though it were one ordinarily pursued to acquire additional funds for use in ordinary banking.

The extent to which the majority opinion seems to be based upon a misapprehension of the facts relative to the $9,000 loan is further illustrated by the following statement in the opinion. Referring to a statement of real estate items which, it is claimed, was sent by Bowman to Thorson at the time Thorson was negotiating for the stock, it is stated: "This statement tells a big tale in itself. It contains the very lands that were deeded to Jensen. It contains a purported state-

ment of the value of such lands, and a list of the amounts that were credited to each of such pieces of land so deeded out of the $9,000 received on the notes." The statement or exhibit referred to does not indicate the source of the $9,000, and is not a clear statement of the condition of the real estate account. It shows, however, a loss of over $3,000 on the supposition that $9,000 of the total investment in the real estate had been previously charged off. In other words, on the supposition that the bank had previously expended capital in real estate to the extent of $25,383.31, which was at the time valued at $22,200, the purchaser of the stock, if he received this statement, would be charged with notice of the impairment of the capital to the extent of $3,183.31, provided that the real estate were worth the appraised value. And he would also be notified that in connection with whatever stock he would buy in the banking enterprise, capitalized at $16,000, he was acquiring an interest in real estate valued as a bank asset at better than 135 per cent of the capital. It is little wonder that the stock was priced at 50 cents on the dollar, and that immediately after Thorson acquired it he levied an assessment, the necessity of which was even recognized by Rosholt when he sold out. Then, if the $9,000 represented as a previous investment of bank capital in the real estate, be considered, as against a purchaser of stock, a debt still owing by the bank and chargeable to stockholders, as found by the majority, the exhibit is made to work a barefaced fraud upon the purchaser. He is required to advance his proportionate share of $9,000, which is represented to have been already paid out. In short, this statement says to him: "We are overloaded with real estate, and our capital is impaired on account of the loss sustained thereby. We have more real estate than it is permissible for us to carry, and more than is consistent with good banking. It stands us at more than $25,000 and is worth perhaps a little better than $22,000. If you will take the stock with our real estate account in this condition, you may have it at 50 cents on the dollar. Perhaps you can levy an assessment and raise sufficient added capital to meet the requirements of the state banking department." The majority opinion allows the individuals who have made this kind of a representa-

44 N. D.—16.

tion to work a fraud upon the purchaser by compelling him to con-tribute a proportionate share of the $9,000 which they represent as having been already expended on account of the real estate. Indeed, "This statement tells a big tale in itself," or, if it does not, it is made to do so. Suppose the bank had owned an automobile for which the vendors of the stock represented that the bank had paid $3,000, and it should be discovered later that the note of these same stockholders given in payment was outstanding. According to the majority opinion, notice that the automobile had cost $3,000 would be notice to the pur-chaser of the stock that the corporation was under obligation to reim-burse the stockholders who had given the note and made the representa-tion that the automobile was paid for. It may well be that the corpo-ration would be liable to the seller for the price of the car, but, if the law still recognizes estoppels, stockholders who made such representa-tions, upon paying their note, would surely be estopped, as against the purchaser of the stock, to seek reimbursement.

Following the negotiation of the loan in 1912, the bank continued business, with the result that it was compelled to take in more real estate in liquidation of bad loans. The real estate account was again overloaded, notwithstanding the previous reduction in 1912. Such was the condition when Thorson purchased his stock, and in this real estate there was tied up what was supposed to be live banking capital not charged off, to the amount of $16,383.31,—that is, according to the telltale exhibit.

There is every reason to believe that after the transaction in 1912, as a result of which the asset value of the real estate was reduced by the contribution of new capital, the accounts were made to conform to the reduction, and it is admitted that the books contained no entry showing the liability of the bank on account of the money borrowed by the stockholders to effect the reduction. If the views of the major-ity are correct, the officers of the bank have doubtless been guilty dur-ing the years following 1912 of falsifying the condition of the bank in the reports to the bank examiner. Yet, though they stand so con-victed by the majority opinion, they are also rewarded in the same opinion by being allowed a recovery predicated upon facts which they themselves have apparently secreted from the public examiner.

I confess I cannot comprehend the elements of justice in a situation where the plaintiffs succeed by first convicting themselves of forgery (Comp. Laws 1913, § 5174), and where they must necessarily do so to support their claim. A judgment in favor of the plaintiffs under these circumstances might possibly be justified in order to prevent some greater injustice, but in the instant case the plaintiffs allege that the lands held by Bowman as security are worth more than the amount they seek from the bank. So, certainly no injustice would result to them by adopting their own allegations as to value, and leaving the real transaction to conform to the ostensible transaction as they themselves wrote it in the books.

The statute is very definite as to the contents of the reports of condition the banks are required to make the public examiner. It says: "Every banking association, savings bank, and trust company organized under this chapter, shall make at least five reports each year to the state examiner, in such form as the state banking board shall prescribe; such forms to be as nearly as possible like those prescribed by the comptroller of the currency for similar reports for national banks. Such report shall exhibit in detail, under appropriate heads, the resources and liabilities of the association at the close of the business on a past day by him specified, which shall, if practicable, be the same day for which similar reports are required from national banking associations within the state by the comptroller of the currency of the United States. Each report must be verified by the oath of the president or the cashier and attested as correct by at least two of the directors, and must be transmitted to the examiner within seven days after receipt of the request for the same, and an abstract of the same in a form prescribed by the board shall be published, at the expense of the association, in some newspapers in the city, town, or village where such bank is located, and in case there is no such newspaper, then in any other newspaper in the county in which such association is located." (Comp. Laws 1913, § 5167.)

Though the officers must have made a number of these reports, based on the condition as shown by the books, they are now permitted to recover on the theory that all of such reports were false. The testimony, in fact, of one of the plaintiffs in this action, shows ex-

pressly not only that the $9,000 obligation was not disclosed to the bank examiner, but that the condition of the real estate account was likewise concealed.

I not only regard the conclusion of the majority as being erroneous for the reasons above stated, but it seems to me that, even conceding that there might be a bank liability to reimburse the stockholders on account of the payment of their personal obligations under the circumstances stated by the majority, they should be able to enforce the obligation as against a new stockholder, acquiring a controlling interest in the bank, only by advancing clear proof that it was an element of the bargain. Yet, not a single plaintiff in this action claims that he communicated any facts to the purchasing stockholder concerning the alleged $9,000 obligation; and they come into court acknowledging that it was concealed and not entered on the books. It was so successfully concealed in fact as to deceive the bank examiner. They are nevertheless permitted by the majority of the court to overcome the estoppel that arises on the face of their own books by a mere conjecture of knowledge on the part of the purchaser,—a knowledge he could not have obtained without delving into the transactions which the plaintiffs themselves attempted to conceal. In short, their attitude is this: "We concealed this transaction, but your auditor, being an expert, either did or should have detected our concealment. Therefore, we are not estopped to assert this liability against you." Common honesty, it would seem, would require that the plaintiffs, if they intended the purchasers of the bank to reimburse them for the payment of the notes in question, should have stated frankly that the notes were outstanding, and that they represented an obligation which should be met by the bank. Yet there is no suggestion of the slightest attempt to conform to this elementary requirement of fair dealing.

Another remarkable feature of the judgment in this case is that it goes against the bank, and leaves the security in the hands of the individual. No reason is assigned for any departure from the ordinary rule, according to which equity, when it obtains jurisdiction, proceeds to administer complete justice, and does not do things by halves. The query arises as to what disposition the majority will make of the land, and what further proceedings, if any, are contemplated

as being necessary. The judgment in this case should be for the defendant and for the interveners, and the holder of the legal title to the land should be declared a trustee for the plaintiffs, who would thus be given the benefit of the profit which, according to their own pleadings, they are attempting to thrust upon an unwilling defendant.

CHRISTIANSON, Ch. J. (dissenting). I concur in the dissenting opinion prepared by Mr. Justice Birdzell. His statement of the facts is so clear, and his reasoning so cogent, that little or nothing can be added. It is undisputed that the $9,000 note involved in this litigation in no manner appeared upon the books of the bank. It is also undisputed that, in the statements which the officers rendered to the state examiner, no reference was made to such note. The $9,000 note was made, and the lands transferred to Jensen, on December 1, 1912. The sale was made to Thorson in March, 1914. During the interim the officers of the bank were required "to make at least five reports each year to the state examiner." (Comp. Laws 1913, § 5167.) And the state examiner was required, "either personally or through deputy examiners," to visit the bank "at least twice each year," and inspect and verify its assets and liabilities, and investigate the character and value of its assets and its method of operation and conduct. (Comp. Laws 1913, § 5146.) It is undisputed that, upon his examinations of the bank, the state examiner did not discover that the $9,000 note was outstanding, or that the so-called equities in land remained part of the assets of the bank. The plaintiff Atkinson admits that the directors intended to conceal these facts from the examiner, and it is undisputed that they succeeded in accomplishing their purpose. The books and records which Thorson was afforded an opportunity to examine before he purchased the stock from the plaintiffs were the same books and records which the state examiner had examined. They gave no information to Thorson which they had not given to the examiner. With full knowledge of the facts, not a single one of the plaintiffs said anything to Thorson in regard to the $9,000 note, or the matters incident thereto. The fact that the bank had paid interest on the note, and received moneys for rent, furnished no information whatever unless those items of income and expense were checked back to their

original sources, and inquiries made with respect thereto. Can it be possible that a purchaser of bank stock is required to check every item of income and disbursement appearing upon the books of the bank for months and years prior to the time of such purchase, in order to ascertain everything connected with such items? Can persons who, with the avowed object of deceiving the public and public officers, make false entries and false reports, later assert such falsity to their own advantage? Can they say to one who has dealt with them with knowledge of such entries and reports, it is true the entries and reports were false, but you had no right to accept them as true; you should have assumed that they were false and acted accordingly? There should be no room for dispute as to how these questions should be answered, as long as the doctrine of estoppel is recognized and enforced by the courts.