53 N.W.2d 11 (1952)
In re RYAN'S ESTATE.
RYAN
v.
CHICOINE et al.
No. 9259.
Supreme Court of South Dakota.
April 18, 1952.
Kenneth F. Simpson and Theodore J. Dolney, Vermillion, for plaintiff and appellant.
A. J. Beck, Elk Point, for defendants and respondents.
SMITH, Judge.
The substantial contention in this contest of the will of Hattie Ryan, deceased, is that the evidence, without dispute, and as a matter of law, establishes a failure to comply with the requirements of SDC 56.0210, in that (1) the testatrix did not publish and declare to the attesting witnesses that the instrument she was subscribing was her will, and (2) the testatrix did not request the attesting witnesses to sign as witnesses. The issues were tried in the county court and a judgment was entered upholding the will. The appeal to the circuit court was limited to questions of law, cf. SDC 35.2104, and resulted in a judgment affirming the judgment of the county court. The contestant has brought his contentions here.
Our statutes provide:
"Every will, other than a nuncupative will, must be in writing, and every will, other than an olographic will and a nuncupative will, must be executed and attested as follows: (1) It must be subscribed at the end thereof by the testator himself, or some person, in his presence and by his direction, must subscribe his name thereto; (2) The subscription must be made in the presence of the attesting witnesses, or be acknowledged by the testator to them to have been made by him or by his authority; (3) The testator must, at the time of subscribing or acknowledging the same, declare to the attesting witnesses that the instrument is his will; (4) There must be two attesting witnesses, each of whom must sign his name as a witness at the end of the will, at the testator's request and in his presence; (5) A witness to a written will must write, with his name, his place of residence; and a person who subscribes the testator's name, by his direction, must write his own name as a witness to the will. A violation *12 of this subdivision does not affect the validity of the will." SDC 56.0210.
"* * * No will or revocation is valid unless executed either according to the provisions of this chapter or according to the law of the place in which it was made, or in which the testator was at the time domiciled." SDC 56.0212.
In accord with the great weight of authority, this court has held that to satisfy the foregoing provisions it is not required that a testator expressly declare to the attesting witnesses that the instrument he is subscribing is his will, or that he expressly request them to sign as witnesses. It is sufficient if, at the time of the execution, he make it manifest to them by either word, sign, or conduct that the instrument is his will and he desires them to sign as attesting witnesses. In re Taylor's Estate, 39 S.D. 608, 165 N.W. 1079; Hauer v. Hauer, 44 S.D. 375, 184 N.W. 1, Id., 45 S.D. 103, 186 N.W. 566; 57 Am.Jur., Wills, §§ 283, 289; 68 C.J., Wills, §§ 337, 345; and 1 Page on Wills, 3d Ed., §§ 365, 378.
In the case of In re Rowland's Estate, 70 S.D. 419, 18 N.W.2d 290, 292, this court held that "Where the attestation clause is full and complete and was read by the witnesses or to them and there is no contest as to the genuineness of the signatures of the testatrix and the witnesses, there arises a strong presumption that the will was duly executed and to defeat probate the presumption must be overcome by clear and satisfactory evidence. * * Such proof, strictly speaking, gives rise to an inference of fact that the will was duly executed and has probative force." Cf. German Evangelical Bethel Church of Concordia v. Reith, 327 Mo. 1098, 39 S.W. 2d 1057, 76 A.L.R. 604, Annotation at 617.
Before describing the circumstances of the signing of the will, we state some additional facts by way of background. Testatrix' husband died in 1917. There were ten children in the family, one of whom failed to survive testatrix. A farm near Jefferson, South Dakota, descended to testatrix and her children in undivided shares. In addition to her undivided interest in the farm testatrix owned a modest residence property in Jefferson. Since 1943 she lived in this residence with a daughter and the daughter's husband. In 1931 she had made a will naming contestant as her sole devisee. The will now in question was signed in July 1949. Testatrix had recently expressed an intention to make a will leaving the residence in Jefferson to the daughter with whom she was living, and "dividing the rest of her property evenly among her children." On the 5th of July 1949, she asked two of her daughters, who were at hand that morning, to request a third daughter, who lived on a farm near by, to go with them to Elk Point and have such a will drafted. The daughters complied with her request. The document so prepared was delivered to testatrix and was placed in a drawer in her bedroom. She was then informed that the lawyer had said she must have two witnesses not mentioned in the will, whereupon she said in substance that she would have her sister, Louise Quistad, and her niece, Ruth Rubida, as witnesses. Louise Quistad had been in the home visiting for some days, and Ruth Rubida lived just across the street.
At this time testatrix was about 78 years of age. Although she had diabetes and an impaired heart and had been in and out of the hospital during the past year, she was neither confined to bed nor to her home. Witnesses described her as alert, interested in everything, strong willed, and sound in mind. The vision of one eye was almost destroyed by a cataract, and a mild cataract had developed on the other eye. Witnesses said she could recognize people across the street when down town, and could and did read the newspapers regularly.
The testatrix, three of her daughters, her sister, Louise Quistad, and a son-in-law were present at the noon meal in the Jefferson home the day the will was signed. For a description of the events which followed we turn to the testimony of those who did not sign the will, before we indicate the nature of the testimony of the witnesses Quistad and Rubida.
After they had finished their meal testatrix brought the instrument into the dining room, placed it on the table and *13 said in substance she wanted the will signed. She asked her sister, Mrs. Quistad, to sign as a witness and asked one of her daughters to get Ruth Rubida for a witness. She then asked the son-in-law to read the instrument. As he read, testatrix was seated at the table, and both she and Louise Quistad were within a few feet of the son-in-law. When he had finished reading he asked, "Is that the way you want it, Mother?" and she said, "Yes." In the meantime the daughter returned with Ruth Rubida and the will was read a second time. Both readings included the entire instrument, the first paragraph of which reads as follows: "I, Hattie Ryan, of Jefferson, Union County, South Dakota, being of sound mind and memory and desirous of making a fair and just disposition of my property and estate, do hereby make, ordain, publish and declare this instrument to be my last will and testament:" The fourth and fifth paragraphs read, "I hereby nominate and appoint my daughter, Louise Chicoine to be the executrix of this my last Will and Testament." I hereby revoke any and all prior Wills or Testaments or Codicils heretofore made by me." The attestation clause reads, "This instrument was on the _____ day of July, 1949, signed, sealed, published and declared by the said testatrix, Hattie Ryan, to be her last will and testament in our presence and we at her request and in her presence and in the presence of each other have subscribed our names thereto as witnesses together with our addresses." After the second reading the testatrix picked up a fountain pen and signed the will. Thereupon the witnesses, who were standing near her, in turn leaned over and signed their names and wrote their respective addresses. The testatrix said, "That's over with." The instrument was then placed in an envelope, and later that afternoon was taken to Elk Point and delivered to the lawyer who drafted it. Testatrix died in April 1950.
The witness Louise Quistad was examined under commission in Salem, Oregon, on July 11, 1950 and was not present at the trial. She thought the instrument was signed within an hour after it was brought from Elk Point, whereas others testified that it was delivered to testatrix on the 5th of July and was executed on the 7th. Mrs. Quistad also added a Mr. Melvin, a notary public of Jefferson, to the list of those present. She remembered the events about as they have been described supra except that she did not think Hattie Ryan said anything before, during or after the execution of the will. The following are typical questions and answers appearing in her deposition:
"Q. Well, who asked you to sign this paper? A. I don't think anyone.
"Q. Do you remember which people suggested you sign this instrument? A. My niece, I think, asked me beforehand.
"Q. When was `beforehand'? A. When they were making out the papers that same day.
"Q. What was said between the various people present when Hattie Ryan signed and just before she signed? A. Nothing, that I remember.
"Q. Did Hattie Ryan ask you to sign the paper? A. No, she didn't.
"Q. Did she ask the other witnesses to sign? A. No, I don't think so.
"Q. Do you remember if Hattie Ryan said anything before you signed? A. No, I don't.
"Q. Did he read it in an audible voice so that you could all hear it? A. Yes, sir.
"Q. Was your sister's hearing very good? A. Very good.
"Q. Your sister's eye sight or vision, how was it at the time the will was executed? A. It was fair.
"Q. Could she, or did she read newspapers or books? A. No, not very much.
"Q. Did she have any trouble making out objects across the table, for instance? A. Oh, no.
"Q. Was her head, her eyes turned toward you and Mrs. Rubida when you both signed? A. I think so, yes.

*14 "Q. Would you say she was bright or dull? A. Very bright.
"Q. Was she other than keen minded? A. No, she was keen minded.
"Q. State whether or not she could grasp the general situation at the time? A. Yes, sir.
"Q. In your opinion, what was her mental condition on July 7, 1949? Was she of a sound mind? A. Very sound minded.
"Q. On what do you base this conclusion? A. She always has been sound minded. There never was any question about her mind at any time.
"Q. Would it be correct to say that you did know what it was? A. Yes.
"Q. Did she tell you anything about it? A. She spoke of it in the morning."
The attestation clause was read to Mrs. Quistad as part of a question and she stated that in reading the will the son-in-law read that clause. This witness stated she thought a will and a deed were the same thing, but she identified the will as the instrument she witnessed and heard read.
Ruth Rubida's testimony was taken by deposition; she was not called at the trial. It discloses that the testatrix had recently expressed to Mrs. Rubida an intention to make a will of the character of the will in question, and that on the day it was signed a daughter of testatrix came to her house and told her that her mother wanted her to come over and sign her will. The following questions and answers are taken from her deposition:
"Q. Were you sitting or standing at the time Hattie Ryan signed the will?
A. I was by the table.
"Q. Were you sitting or standing?
A. I just bent over and signed my name is all.
"Q. Who handed the will to Hattie Ryan to sign? A. Harry read the will to her so he handed it to her.
"Q. Can you recall anything that was said at the time that Harry handed the will to Hattie Ryan or put it in front of her? A. No. I don't remember anything that was said.
"Q. Did Hattie Ryan say anything?
A. No, she just signed her name that was all.
"Q. After Hattie Ryan laid the pen down you picked it up, the pen, is that right? A. Well, Louise signed it and I signed it and then I went home.
"Q. Can you remember anything that was said between the time that Hattie Ryan signed and the time you and Louise Quistad signed? A. No.
"Q. So far as you observed Hattie Ryan was perfectly willing to sign.
A. Yes."
The contestant contends that this evidence establishes without dispute, or as a matter of law, that the testatrix neither declared the instrument to be her will nor did she request Mrs. Quistad or Mrs. Rubida to sign as attesting witnesses. The test, as indicated by the foregoing authorities, is whether the exhibited conduct of the testatrix made it manifest to the attesting witnesses that she was publishing this instrument to them as her will, and was requesting them to sign as attesting witnesses.
Because we think the record offers support for logical inference on the part of the trier of the fact that the conduct of the testatrix made it manifest to the attesting witnesses that she was publishing the instrument to them as her will and was requesting them to sign as attesting witnesses, we hold the contention of the contestant inadmissible.
The instrument itself, and all of the testimony we have described was available to the trier of the fact as the basis for its findings. Cf. 57 Am.Jur., Wills, § 909. The testatrix and her chosen witnesses were all of sound mind; they all spoke and read the language employed, and they all had sight and hearing adequate for the matter in hand. It must be presumed that they exercised their faculties. The testatrix had previously informed both witnesses of her intention to make a will. *15 She produced this instrument in the presence of three of her daughters, a son-in-law and Mrs. Quistad and said in substance that she wanted to sign the will. There is testimony that she asked Mrs. Quistad to be a witness, and sent her daughter to ask Mrs. Rubida to come over and sign as a witness. She then asked the son-in-law to read the will. He read it once before and once after Mrs. Rubida arrived. That instrument read, "I, Hattie Ryan * * * do hereby make, ordain, publish and declare this instrument to be my last will and testament" and contained other language describing it as her will. After the instrument containing this declaration had been read to her and these witnesses, she adopted its words as her own by subscribing her name thereto in their presence. Thereupon, these witnesses, who had listened with her to the reading of the attestation clause, adopted its words as their own by subscribing their names thereto, while her eyes were turned toward them. Thus they said to her, you have declared this instrument to be your will, and at your request we are signing it as attesting witnesses. Her complete acquiescence was indicated by her conduct and by saying "That's over with." Such are the inferences we think the trier of the fact was warranted in drawing from the evidence.
Under strikingly similar circumstances, other courts have held that publication, and a request that the witnesses sign as such should be inferred. In re Cullberg's Estate, 169 Cal. 365, 146 P. 888, 889; and Schierbaum v. Schemme, 157 Mo. 1, 57 S.W. 526, and cf. 57 Am.Jur., Wills, § 283.
In the Cullberg case, supra, the will, including the attestation clause was read to an ailing 80-year old testatrix, who spoke no word during the whole proceeding. The court said,
"Notwithstanding the silence of Mrs. Cullberg, we think the court should have found that due execution of the will had been shown. As we have very recently had occasion to say, it is not necessary that the testator should have spoken words declaring the document to be his will, or that he should expressly request the witnesses to sign it as such. It is sufficient if this declaration and request are unmistakably indicated to the persons signing as witnesses by the testator's conduct and action, although there is no declaration in words to that effect. Est. of Silva [169 Cal. 116], 145 Pac. 1015. Unless Mrs. Cullberg was incapable of understanding what was going onand this was not shown and is not presumedthe whole course of proceedings was inconsistent with any other conclusion than that she intended to have those present know that she gave effect to the paper as her will, and that she desired Dr. Holmes and Mrs. Bowen to sign it as attesting witnesses. It was perfectly apparent that Isaac Cullberg, Jr., was acting in her behalf for the purpose of assisting her to make a will. When he had her sign the paper which had been read, and then asked the physician and the nurse to sign at the end of the attestation clause which had also been read, her silent acquiescence was, under the circumstances, open to no other interpretation than that she joined in or approved the declaration and request which had been made on her behalf. The courts have, of course, no right to dispense with proof of any of the statutory requirements for the making of wills * * *; but, in determining what is required, regard should be had to the essential purpose of the various provisions, rather than to a strict and rigid reading of the words used by the Legislature."
The contestant predicates his argument upon our decisions in the cases of In re Taylor's Estate, 39 S.D. 608, 165 N.W. 1079; Hauer v. Hauer, 45 S.D. 103, 186 N.W. 566, Id., 44 S.D. 375, 184 N.W. 1; and Kittleson's Estate v. Kittleson, 42 S.D. 126, 173 N.W. 161. Their facts distinguish those cases from the circumstances at bar.
In the Taylor case, supra, it was said [39 S.D. 608, 165 N.W. 1080],
*16 "Not a single surrounding or accompanying fact or circumstance was proven from which we could infer that this witness was mistaken, and that, in some manner, there was published to this witness the fact that the instrument he was subscribing as a witness was a will; and there was certainly no such fact or circumstance proven as would permit us to infer that Mrs. Taylor, in any manner by the word or act of herself or any other person, published to this witness the all important fact that she knew the instrument to purport to be her will. The purpose of this statutory provision is clear; it is to require proof, not only that a testator executes the writing, but, what is even far more important, that he understands the nature of the same."
The facts in Hauer v. Hauer confronted the court with a problem because the testatrix and one witness were unable to communicate with each other. She could neither speak nor understand English, and he could neither speak nor understand German. The will was in English and was not read in the presence of the testatrix and her witnesses. Its main provisions were explained to her in German by the one witness who spoke that language.
In the Kittleson case, which involved a testatrix of Norwegian extraction, who could neither speak nor understand the English language, it was written,
"In this case there is no evidence whatever, either by statement of the testator himself to the subscribing witness, or otherwise, that the testator knew he was signing a will, or had any knowledge of the contents of the instrument he signed. The subscribing witness, Daigle, was not acquainted with and had never seen the decedent prior to that occasion; could not speak or write the Norwegian language, and had no communication with him concerning the instrument he saw him sign." [42 S.D. 126, 173 N.W. 162.]
We hold the trial court was not required to find that the evidence was sufficient to overcome the presumption or inference of due execution, to which reference is made in the quotation from In re Rowland's Estate, supra.
The contention that decedent's signature to this will was obtained by fraud, trick and artifice has been considered. We are of the opinion that such a finding was not impelled by the evidence.
The judgment of the trial court is affirmed.
All the Judges concur.