On a motion for a nonsuit, evidence is construed most strongly in favor of the plaintiff, and a nonsuit should not be granted when there is any evidence which tends to sustain the plaintiff's action, or from which the jury can fairly infer a state of facts favorable to the plaintiff.
 DECIDED SEPTEMBER 29, 1945.
This is an action for damages brought by Mrs. E. B. Mason against Dr. W. D. Hall. Upon the conclusion of the plaintiff's evidence, a nonsuit was granted, and the sole exception is to that ruling. *Page 868 
Briefly stated, the petition as amended sets out that, on October 6, 1943, the plaintiff received from a fall an injury to her back, resulting in a compressed fracture of the body on the 12th dorsal vertebra; that on October 8 she went to the Johnston-Hall Hospital at Calhoun, Georgia, for treatment by the defendant, who is a legally qualified practicing physician and surgeon; that in diagnosing her case the defendant made only one X-ray picture of the injured part of her spine, which picture was made from the back, and then advised her that she had no broken bones and could return to her home; that she returned home in accordance with the advice of the defendant, but continued to suffer severe pain and was confined to her bed for a period of four weeks; and that on January 20, 1944, she consulted Dr. Trammell Starr of Dalton, Georgia, who made an X-ray picture of her injured spine from a side view, which picture disclosed that she had suffered a compressed fracture of the body on the 12th dorsal vertebra, for which injury proper treatments would have been the immobilizing of the spine with a plaster-of-paris cast or the placing of the patient on a Bradford Frame (a hard bed). It was alleged that, the defendant possessed sufficient skill to have correctly used an X-ray in discovering the extent of the plaintiff's injuries and in properly treating her; that the defendant was negligent in not making an X-ray picture from a side view, and ordinary care and diligence required that he make a picture from a position other than from the back; that, if the defendant had made pictures both from the side and back, he could and would have discovered the fractured vertebra, and have given her the necessary and proper treatment; and that, on account of the negligence of the defendant in failing to properly diagnose her injury, and in failing to administer the proper treatments for the same, she has suffered, and will continue to suffer, excruciating pain, and much mental pain and anguish due to her inability to perform her household duties, and she has sustained a permanent injury, a loss of continuity of the spine, causing her to have a humpback. These are substantially the allegations as to negligence and injuries made by the plaintiff. She sued for $15,000 for both past and future physical and mental pain and suffering.
The defendant denied that he was negligent in either diagnosing the plaintiff's injury or in treating her, but admitted that he *Page 869 
made one X-ray picture of plaintiff's spine, and it failed to disclose any fracture, and that he probably advised her to return to her home. He alleged that, it was customary in that community to make only one X-ray picture of an injury such as the plaintiff had suffered; that he gave her the usual and customary examination and proper treatment; that he had no opportunity for other or further treatment, because the plaintiff did not return for treatment or notify him that her condition was not making satisfactory progress; and that he did not know for many months thereafter that her injuries had not healed. He alleged also that if she had returned to him for further treatment, or had notified him that her condition was not satisfactory and had called for further examination or treatment, other treatment would possibly have been given her.
Dr. Hall, the defendant, sworn for the purpose of cross-examination by the plaintiff, testified in part: That the X-ray was considered by the profession generally as one of the best methods of ascertaining whether or not a patient has a broken bone; that he took an anterior-posterior view from the front in making an X-ray picture of Mrs. Mason's spine; that this was the only picture he made, and he did not see any fracture disclosed by it; that a picture could be taken from the back or front of the spine and from a lateral view which is a side view, and, if he had made a picture from the back and one from the lateral view, that would have given him a complete picture of the vertebra under suspicion; that, to have made another picture from Mrs. Mason's side, it would have been necessary only to have placed another film in the X-ray and to have turned her on her side; that a compress fracture is one part of the vertebra pressing into another part, and he was familiar with the correct treatment for such fracture; and that it is not necessary to immobilize the entire spinal column, although that is one of the correct methods of treatment. As to his method of immobilizing a compress fracture of the 12th dorsal vertebra, he testified that he might strap it, he might place the patient in bed only for rest, he might put a cast on it, or he might put the patient on a hypertension frame; there are no set rules for treating fractures, each fracture is an individual case which must depend on the judgment of the doctor treating it. As to how he would go about treating a person who has suffered from a *Page 870 
fracture of the 12th dorsal vertebra, in the average case, he said, this is simply to immobilize it in whatever way the physician thinks best, by adhesive tape, by plaster of paris, or by merely placing the patient at rest; kyphosis, commonly known as "humpback," is not necessarily a common result of failure to immobilize the spinal column when there is a fracture of the vertebra, but it could occur; a person can have four or five different kinds of fractures to a vertebra; the recognized treatment for each of them is to immobilize the spine, and putting the body in a plaster-of-paris cast is one of the recognized ways to immobilize the spine; "I did not use that one in her case; I didn't know that she had that fracture; if I had known that then, the correct treatment under those circumstances would have been to immobilize the spine," by either placing her on a Bradford Frame, a hard frame, one of the recognized frames, or by encasing her body in a plaster-of-paris cast, or by strapping her or placing her in bed; "the reason I used my X-ray in Mrs. Mason's case, I suspected she might have a fracture of one of her vertebrae; it is a common practice when you have a patient that you suspect having a fracture to use the X-ray to determine whether or not the patient has a fracture, and in Mrs. Mason's case I only made one picture. . . I did not make any picture from a lateral view."
E. B. Mason, the husband of the plaintiff, testified: That after Dr. Hall had made the X-ray picture of the plaintiff's spine, the doctor said that there was no fracture, no broken bone, and he just strapped her up, "said it would take time, it was a wrenched back. He told her to rest. That is all he did for her. Yes, she continued to suffer on for about three-and-a-half months; then we decided she had better see another doctor, and took her to Dr. Starr at Dalton. As to whether or not Dr. Hall said anything to me or to Mrs. Mason about coming back for further treatment — never did mention a thing about it, like he done all he could do and it would take time." Mr. Mason also testified that, he wanted to leave Mrs. Mason at the hospital in Dr. Hall's care and where they could take care of her, but the defendant said, "No use, take her back home, it will just take time;" that he wanted his wife "to stay at the hospital, and they wouldn't let her stay."
Mrs. Mason, the plaintiff, testified in part as follows: "When I came to the hospital, as to what Dr. Hall did for me — well, he *Page 871 
didn't do anything, only take the picture. As to what he told me about my injury — well, he said it was a wrenched back. Yes, I told Dr. Hall about how I was injured, how I received the injury; I also told him I was suffering pain; I did that on this trip, and I was still suffering pain when I went back to him at the hospital. As to whether or not I told him that — well, I was anyway, I don't remember telling him. Dr. Hall didn't tell me to do anything after he made the X-ray picture; he didn't tell me anything; he told me I had a wrenched back. As to whether or not he told me anything to do for that wrenched back — well, he said it would take time, said it would take a longer time for a wrenched back to heal than a broken bone. He didn't make any recommendations to me as to what I should do to aid my back, not a thing. Yes, I continued to suffer with my back." She testified also that, as a result of the injury, she could not do anything but very light house work, could not sweep or make up beds, and could not stoop, and her back "is crooked and stiff, and I continue to suffer pain;" and that she didn't go back to see Dr. Hall, or send him word that she wasn't getting along all right, because they said it was a wrenched back and would take time.
Dr. Trammell Starr, a witness for the plaintiff, testified in part substantially as follows: Mrs. Mason came to me in January, 1944, complaining of an injury to her back. I made an X-ray, I made one, and that was from the side. I have it with me, it disclosed what appears to be an injury to one of the vertebrae, I think it is the 12th dorsal vertebra. She was lying on her side when I made this X-ray, the injury seems to be the body of the vertebra, it appears to be a compress fracture. My method for treating a fracture of this kind would be to put them to bed, hard bed, sometimes put them in plaster, sometimes don't; the proper treatment of a fracture of this kind would be to fix or immobilize the spine to a certain extent. She complained of some pain in her back and some stiffness; you would naturally expect that regardless of what you do; as a matter of fact, stiffness in the back is what you are trying to get. Different doctors have different methods of treating injuries of this kind. "As to whether or not I would say there was any negligence in not making different X-ray pictures under the circumstances such as existed in this case — well, I really don't know how to answer that question. I would *Page 872 
say I think any good conscientious doctor would make as many X-rays as he thought was necessary. If he made one and found no fracture, as to whether or not it would be considered negligence in not going ahead, making different X-rays at different angles — well, I think that would be based on whether he thought it was necessary or not. If he made one and found no fracture and thought [it] not necessary to make any more, as to whether or not there would be anything unusual in that — well, I don't think it is unusual, I have done it plenty of times; I base it on what I have done, not what he should have done, I say that is very common practice." I believe I recommended to Mrs. Mason that she obtain a brace to wear. At the time I saw her, I thought it might probably give her some relief. As to whether or not the first method of making an X-ray, where a patient has received an injury to the spine, is to place the patient on her side — that is one method, you can take two different views, that is just one of the views. I probably would have determined it necessary to make an X-ray, if in the beginning I didn't find the trouble, and the patient continued to have pain, I would probably have looked further. Supposing that I had looked further and made one X-ray and it didn't show anything, I might have made some other X-rays. The method I use in treating a fracture of this kind is bed rest, extension, sometimes casts, sometimes plaster, sometimes plaster-of-paris cast. If you take a picture from the front and it doesn't show any injury, as to whether you would turn her over and take it from the back — not necessarily. I have X-rayed a great many patients myself and I have only taken one position; it depends on the individual case, every fellow examines his own patient and decides what is the right thing to do. "Supposing a person would come in and complaining of having received this lick, and having for two or three days suffered severe pain in her back, giving me that history, and I took an X-ray from the front or the back, either one, and it didn't disclose any fracture, and then she continued to suffer, as to whether or not I would not then make another X-ray — well, I don't know what I would do. I would do what I think was the right thing to do. As to what would be the right thing to do — well, I think I answered that by saying the right thing to do is what you think is right. I would be governed entirely by the patient, what I found *Page 873 
on examination . . and what I did at that time would be based on what I found. . . I have had to make one, two, or three [X-rays] at times, lots of times I have made only one X-ray." I don't know whether it was necessary to make another X-ray. "I only made one X-ray in many instances because I thought it wasn't necessary to make but one X-ray. You have to assume that when a doctor sees a patient he does for that patient what he thinks is right, whether one X-ray or a dozen X-rays, that is what he ought to do. . . As to what I would think this particular individual, whose injury you have described to me would need — well, I don't know what she would have needed, I didn't see her at the time of the injury." I have had cases of this same kind and character. Sometimes I have X-rayed them and sometimes I haven't X-rayed them, sometimes I X-ray them in two positions; every patient is a law unto himself, and the doctor should decide what is necessary to do to that particular patient. "Supposing that I had made this first X-ray and it hadn't disclosed any injury, as to whether or not I would have stopped there — well, I have done it plenty of times. With reference to this particular patient, I probably would have based it on what I have done in the past."
The only question is whether the evidence was sufficient to withstand a nonsuit. In deciding that question we must construe the evidence most strongly in favor of the plaintiff. Highsmith v. National Linen Service Corp., 63 Ga. App. 112
(10 S.E.2d 237); Watkins v. Dalton Coca-ColaBottling Co., 66 Ga. App. 848 (19 S.E.2d 316); NationalLand Coal Co. v. Zugar, 171 Ga. 228 (2) (155 S.E. 7). A motion for nonsuit should not be granted when there is any evidence tending to sustain the plaintiff's action, or when the jury can fairly infer from the evidence a state of facts favorable to the plaintiff. Moseley v. Patterson, 27 Ga. App. 133,135 (107 S.E. 623); Gresham v. Stewart, 31 Ga. App. 25,27 (119 S.E. 445); Starr v. Greenwood, 48 Ga. App. 535,540 (173 S.E. 243); Hawkins v. National SuretyCorp., 63 Ga. App. 367, 372 (11 S.E.2d 250); East WestR. Co. v. Sims, 80 Ga. 807 (2) (6 S.E. 595); Stephens v.Stephens, 168 Ga. 630, 645 (148 S.E. 522). The jury may, from facts proved, *Page 874 
and sometimes from the absence of counter-evidence, infer the existence of other facts reasonably and logically consequent on those proved. Code, § 38-123.
"A person professing to practice surgery or the administering of medicine for compensation must bring to the exercise of his profession a reasonable degree of care and skill. Any injury resulting from a want of such care and skill shall be a tort for which a recovery may be had." Code, § 84-924. This section is applicable to a physician in administering X-ray treatments. The standard prescribed by the Code section, when applied to the facts and circumstances of any particular case, must be taken and considered to be such a degree of care and skill as, under similar conditions and like surrounding circumstances, is ordinarily employed by the profession generally. The true rule is that the skill prescribed by the Code is not such as is ordinarily employed by the profession in the particular locality or community; but the jury may, in determining what is reasonable care and skill under the circumstances, consider the degree of care and skill practiced by the profession generally in the locality or community. Kuttner v. Swanson, 59 Ga. App. 818
(2 S.E.2d 230), citing Fincher v. Davis, 27 Ga. App. 494
(108 S.E. 905); McLendon v. Daniel, 37 Ga. App. 524, 528
(141 S.E. 77); Hughes v. Weaver, 39 Ga. App. 597
(148 S.E. 12); Radcliffe v. Maddox, 45 Ga. App. 676, 680
(165 S.E. 841); Pace v. Cochran, 144 Ga. 261 (86 S.E. 934).
The defendant made only one X-ray picture of the plaintiff's spine, although he suspected that she might have a fractured vertebra. Another picture from another view would doubtless have disclosed the fracture as suspected by the defendant. Another picture three-and-one-half months later, made from a side view, did show the fracture, and there was no evidence indicating that it was not equally discoverable when the defendant made the first picture. Dr. Starr's testimony, while tending generally and substantially to exonerate the defendant, did not show that the defendant, in diagnosing the plaintiff's condition, adopted the methods ordinarily employed by the profession generally. His testimony was very largely based on his personal experience and on methods and treatments he had used himself. It is a question of fact for the jury to determine what is reasonable care and skill, where there is *Page 875 
any evidence tending to sustain the plaintiff's action. As stated by Judge Bleckley in Vickers v. A. W. P. R. Co., 64 Ga. 306: "Nonsuit is a process of legal mechanics; the case is chopped off. Only in a clear gross case is this mechanical treatment proper. Where there is any doubt another method is to be used — a method involving a sort of mental chemistry; and the chemists of the law are the jury. They are supposed to be able to examine every molecule of the evidence, and to feel every shock and tremor of its probative force." We therefore conclude that there was some evidence which tended to support the plaintiff's contentions, and from which the jury could have fairly inferred a state of facts favorable to the plaintiff, and that the court erred in withholding the case from the jury, and in granting a nonsuit.
Judgment reversed. Sutton, P. J., and Felton, J., concur.