## BURTON *et al. v.* HART.

No. 16780. October 12, 1949.

*Moreton Rolleston Jr.,* for plaintiffs.

*J. Ralph McClelland Jr.,* and *George & John L. Westmoreland,* for defendant.

WYATT, Justice. ■ There was no evidence to support the allegations of fraud and undue influence. We are, therefore, first presented the question as to whether or not there was sufficient evidence of mental incapacity at the time of the execution of the deed in question to prevent the grant of a nonsuit.

The plaintiffs introduced evidence showing that William Pattman was 71 years of age, had been in declining health for several years; that he worked as a janitor at Carnegie Library in Atlanta for 40 years, and was retired on a pension in 1940 because of failing health; that in 1942 he was in an automobile wreck and after that "became more feeble."

Ernest Pattman Jr., a nephew, testified: "William Pattman was my daddy's brother. . . I have known him all my life, ever since I remember I was going around them. . . I lived with my uncle and aunt when I was younger. . . After the accident in 1942 I would go over there on Sunday to see them. . . He would look at me like he did not recognize who I was. . . He called me different names. . . He could not control himself physically, he could not dress himself. . . At the time William Pattman executed the deed to the homeplace, giving it to Fannie Pattman, it is my opinion that his mental condition at that time was not such that he could understand what he was doing. . . William Pattman was not in a mental condition so that he could understand what he was doing for four or five months before Fannie Pattman died in June, 1944."

Nellie Brockman, a niece, testified: That she went to the home of William Pattman two or three times a week to help out with the house work; that "he was just like a baby, he would get up in the morning wet, and during the day it would be worse than that. . . One time when William was out on the front porch, he pulled his private out on the front, and people were across the street on the porch and they laughed. . . He would talk crazy talk and ask me who his people were. . . Said he had so many bank books he did not know where they were. . . He said, 'Whose car is that out there?' I said, 'That is your car.' He said, 'No, that ain't my car.' . . Those things that I have just recited happened more than once."

Cora Pattman Burton, a sister, testified: That she spent four or five weeks in the home of William Pattman in 1943.

"At that time in 1943, William could not dress himself. He would pull his clothes off and get buck naked during the time I was there."

James Thompson testified: That he was an assistant to William Pattman and worked with him for 17 years. "After he left the library, I would visit him occasionally at his house. Maybe I would go twice a month, or sometimes it would be a couple of months before I would go up there. . . I would go there sometimes and he did not know me until he had looked at me a long time, and then he realized who I was; but he did not have anything to say to me. . . William Pattman's general condition was bad about six months before Fannie died. At that time he did not know anybody much. His mental condition was pretty bad according to my notion. He didn't know anybody. For this period of approximately six months before Fannie died, William Pattman's condition was such that he did not have a clear and full understanding of the nature and consequences of his acts in executing any paper."

The above quotations are excerpts from so much of the testimony as is deemed material to the question now under consideration. Certified copies of proceedings in the Court of Ordinary of Fulton County were introduced in evidence, showing that William Pattman was duly adjudged to be a person of unsound mind on July 27, 1944.

On the question of granting a nonsuit, our Code provides: "A nonsuit shall not be granted merely because the court would not allow a verdict for plaintiff to stand; but if the plaintiff fails to make out a prima facie case, or if, admitting all the facts proved and all reasonable deductions from them, the plaintiff ought not to recover, a nonsuit shall be granted." Code, § 110-310. In passing upon the question as to whether or not a nonsuit should have been granted, we must construe the evidence most strongly in favor of the plaintiff. See *National Land & Coal Co.* v. *Zugar*, 171 *Ga.* 228 (2) (155 S. E. 7); *Mason* v. *Hall*, 72 *Ga. App.* 867 (35 S. E. 2d, 478), and cases there cited.

As far back as 1879, in *Vickers* v. *Atlanta & West Point Railroad Co.*, 64 *Ga.* 306, this court said: "Nonsuit is a process of legal mechanics; the case is chopped off. Only in a clear, gross case is this mechanical treatment proper. Where there is any

doubt another method is to be used—a method involving a sort of mental chemistry; and the chemists of the law are the jury. They are supposed to be able to examine every molecule of the evidence, and to feel every shock and tremor of its probative force."

"If there be any evidence whatever to sustain the action, it must go to the jury, the court having no discretion in the matter of granting a nonsuit; but on motion for new trial, the court may exercise its discretion, and in many cases a new trial should be granted where a motion to nonsuit would be properly overruled." *East & West Railroad Company of Ala.* v. *Sims,* 80 *Ga.* 807 (6 S. E. 595). " 'If there be any evidence upon which a verdict could be rendered, the case should not be withholden from the jury.' *Tison* v. *Yawn,* 15 *Ga.* 491, 493. The rule as laid down in innumerable Georgia decisions is that, 'If there is sufficient evidence to authorize the jury to find for the plaintiff, although it may not be sufficient to require them to do so, a nonsuit will not be granted.' 4 Mich. Dig. Ga. R. 553, and cit. It is also the general rule that a nonsuit will not be granted unless all the facts proved and reasonable deductions therefrom do not entitle the plaintiff to recover. Although there may be no conflict in the evidence, the matter should be left to the jury where reasonable men might differ as to the inferences to be drawn from certain evidence." *Elrod* v. *McConnell,* 170 *Ga.* 892 (1) (154 S. E. 449).

We hold—applying these rules of law to the evidence in this case, excerpts from which have been quoted in this opinion—that there was enough evidence to go to a jury, and a nonsuit should not have been granted.

The defendant in error cites and relies upon *DeNieff* v. *Howell,* 138 *Ga.* 248 (5) (75 S. E. 202), and *Thomas* v. *Lockwood,* 198 *Ga.* 437 (1) (31 S. E. 2d, 791). This court, in those cases, simply defined the mental capacity necessary in order to execute a deed, and held that there was not sufficient evidence in those cases to show such mental incapacity after all of the facts had been submitted to a jury, while in the instant case we are simply holding that the facts presented by the plaintiff, were sufficient, to go to a jury, and a nonsuit should not have been granted.

The defendant in error insists that the grant of a nonsuit

was proper because the plaintiffs in the court below failed to produce any evidence of fraud or undue influence, and the suit could proceed no further for the reason that the plaintiffs were not in possession of the property and, therefore, could not maintain an equitable petition to remove a cloud upon their alleged title. The cases of *Mentone Hotel & Realty Co.* v. *Taylor,* 161 *Ga.* 237 (130 S. E. 527); *Sweat* v. *Arline,* 186 *Ga.* 460 (197 S. E. 893); and *Oglesby* v. *Oglesby,* 198 *Ga.* 864 (32 S. E. 2d, 906), are cited and relied upon.

True it is that all of these cases recognize that "the general rule is that in order for a plaintiff to maintain an equitable petition to remove a cloud upon his title, he must allege and prove actual possession in himself." This well-recognized rule of law is based upon the proposition that ordinarily, where the defendant is in possession, the plaintiff has a remedy at law to test his title by ejectment. There are, however, certain well-recognized exceptions to this general rule, one exception being "where there is a distinct head of equity jurisdiction sufficient to support the action, as where deeds are obtained by fraud or other illegal means." The last three cases cited recognize this as one of the exceptions to the general rule. In *Oglesby* v. *Oglesby,* supra, this court, in discussing this exception, said that it applies in case of "fraud or a prayer for a decree of title in the petitioner." In the instant case, one of the prayers is "that title to the real estate known as No. 173 Fort Street, N. E., as more particularly described hereinabove, be decreed to be vested in petitioners." This would seem to be sufficient to come within the above-referred-to exception to the general rule here relied upon. Moreover, in this case it is alleged that the deed sought to be canceled was executed by a person without mental capacity to execute a deed, and that he remained in that condition until the time of his death. Under such circumstances, there exists "a distinct head of equity jurisdiction sufficient to support the action" regardless of the question of fraud. See *Boynton* v. *Reese,* 112 *Ga.* 354 (37 S. E. 437).

From what has been said above, it follows that the granting of a nonsuit was error.

*Judgment reversed. All the Justices concur.*