1. In order to avoid a deed on the ground of mental incapacity of the grantor, he must have been non compos mentis, that is, entirely without understanding, at the time the deed was executed.
(a) The evidence in this case was insufficient to show such incapacity on the part of the grantor, and therefore the verdict for the plaintiff, cancelling the deed, was contrary to the evidence and without evidence to support it as related to that issue.
2. Nor did the evidence authorize a finding that the deed was never delivered.
3. The judge charged the jury: "If one should have mind and reason sufficient to have a decided and rational desire as to what disposition he wishes to make of his property and to clearly understand and appreciate the nature and consequences of his act in making a deed of gift, and he should make such a deed of conveyance of his property, having at the time such decided and rational desire to do so, and mind and reason to clearly understand that the nature of his act was to execute a deed to his property and that the consequences of his act was to divest it in another, he would be capable of making a deed of gift under the laws of this State though he might not have had a greater mental capacity than that. If you believe from the evidence and the circumstances of the case that he did not have such mental capacity at the time he signed the deed, as I have defined to you, in that event, you would find for the plaintiff." *Page 438 
(a) The instruction was not erroneous as against the defendant because of a failure to charge on the presumption of sanity and the burden of proof.
(b) The complaint in the motion for new trial that the verdict was contrary to the quoted excerpt presented no question which was not raised by the general ground that the verdict was contrary to law, and hence need not be separately passed upon.
(c) There is no merit in the contention that the foregoing charge was erroneous because of the clause therein referring to "decided and rational desire."
4. The judge did not err in failing to charge the law in regard to gifts causa mortis, as stated in the Code, § 48-201. Such a charge would not have been applicable to any issue in the case.
5. As indicated in the first and second headnotes, and corresponding divisions of the opinion, the verdict for the plaintiff was contrary to the evidence and without evidence to support it, and for this reason alone it was error to refuse a new trial.
 No. 14944. OCTOBER 13, 1944.
Minnie Lockwood filed, in the superior court of Richmond County, a suit against Norma Thomas, for an injunction and the cancellation of a deed. The defendant filed an answer, after which the plaintiff amended her petition. It appears from the record that Minnie Lockwood was the wife of the grantor, new deceased, and that Norma Thomas was his sister-in-law by a former marriage.
The petition as amended alleged: The plaintiff is the widow and sole heir at law of Tony Lockwood, who died intestate on November 8, 1942, leaving an estate consisting of real and personal property. Besides other real estate, he left a described tract situated on Market Street in Augusta, Georgia, which has been set aside as a year's support to the plaintiff. She is now in possession of this property, and has been since the death of her husband, and the defendant is trespassing on said property and interfering with her right of possession and enjoyment. The defendant is claiming the property under a deed from Tony Lockwood, executed on November 7, 1942. Tony Lockwood was unconscious and in a dying condition at the time he executed this deed, being in the last stages of Bright's disease, and suffering from a cerebral hemorrhage. He did not know and could not have known that he was executing a deed to his property, and he was mentally incapable of executing the same. Nor was the deed ever delivered. *Page 439 
Therefore the deed is void and should be cancelled.
The defendant's answer alleged that the deed was executed to her by the grantor when he was mentally sound, that the consideration was good and valid, and that she was entitled to possession of the property. On the trial before a jury, a verdict was returned for the plaintiff cancelling the deed. The defendant's motion for a new trial was overruled and she excepted.
The following evidence was introduced by the plaintiff: The plaintiff testified: "I went there to see Tony that Friday before his death. You couldn't understand nothing he was saying. He was just lying there breathing with his mouth open. You couldn't understand nothing he said if you tried to ask him anything. He had a stroke of apoplexy on Thursday and he was unconscious when I saw him on Friday. He was in a dying condition. . . If you asked him anything, he would lay there with his mouth working trying to mumble something. He was suffering with nephritis or Bright's disease. . . Me and Tony have never been separated. He was back and forth to see me, and bring me fruit. . . I was out there at [my sister's] house sick. . . All my furniture and my clothes were right there in my house. I had been at my sister's backwards and forwards about two months. Some days when I would feel able and could get up there, I would go up there and do something about the house — when I felt able to do it. We ain't never had no separation. Some days I would feel better and I would go backwards and forwards up there. . . I came to see him Friday because he was sick, and I went up there and did the best I could to get up there. It had been just about a month before that when I saw him, because he wasn't sick more than a week. He was taken that Monday, I believe it was, and died that Sunday night. I wasn't there on Saturday afternoon before he died Sunday night. I wasn't there when you went to Tony's to draw up that deed. He died the following Sunday."
Isaac McManus testified: "I knew Tony Lockwood. . . As to whether I saw him when he was sick, I taken him home from the cafe where he was working at. . . He was complaining from his head. That was on — if it wasn't Monday, it was Tuesday. After that they called the doctor. . . I went up there after the doctor come and Tony was laying there, a dead man I would call it. He wasn't saying nothing to nobody. He remained in that *Page 440 
condition until he died. As to whether Tony was ever able to talk intelligently with me, will say, he ain't said nothing to me. I went up there two or three different times after that, at night after I knocked off, and he didn't seem to get no better. He died from it. He died on Monday night. When I saw him he was laying up there. You ever went to see somebody and you say, `Well, he ain't nothing but a dead man,' that is what us pronounced it, and they started to send out for everybody to come see him then, and he ain't never got back straight. He died just laying up there in bed. I had known Tony all my life. . . I was not there in the room where you were when he signed the deed. I was not even in the house and nowhere around it."
Rosa Brooks testified: "I know Tony Lockwood. . . I saw Tony before he died. I went around there to my cousin's on Wednesday; she lived above him, and she told me Mr. Tony was sick. . . I goes to see him and goes on in the room where he was, and I calls to him, `Mr. Tony, how do you feel?' and he never have said anything to me. He ain't even opened his mouth nary time. He was unconscious; just like this piece of wood; never even looked up at me or nothing. . . That was Wednesday. . . Nobody else was in the room. . . He was there all by himself, unconscious. I tried to speak to him and he did not speak."
Harris Peek testified: "I know Tony Lockwood, and been knowing him about twenty years. Previous to his death, when he was taken sick, I went to see him on Wednesday, and he didn't even know me or nothing. I doubled back there Friday, and he was still in the same condition, only worse; he couldn't talk. And on Sunday he died. Friday was the last time I saw him before he died, and he was worse Friday than he was Wednesday. . . The last time I was at Tony's house was on Friday evening. I was not up there on the Saturday afternoon before his death, so I don't know what his condition was at that time."
Elizabeth Gates testified: "Minnie Lockwood is my mother. I know Tony Lockwood. He was my stepfather. . . I lived about a block or a little over from Tony's house. I saw him during his last illness. I went around there the last week he was sick three times, and each time I went he didn't pay me no attention. He always teased me and I tried to say something to him, and I carried him some soup, and he didn't eat it and he just kept his face in the *Page 441 
corner of the house all the time. He was unconscious; he didn't pay me no attention. I tried to talk to him. I knelt down side the bed. . . It was on a Sunday night that Tony died. That was on the 9th of November last year. I think it was Wednesday, Thursday, and Friday that I went to see Tony before he died. I didn't see him Saturday. He was like that the first day I went there, and was in that condition every time I went. He was getting worse each time I went, because he wouldn't say nothing, couldn't get anything out of him at all. . . I think the last time I was there was on Friday before he died on Sunday. I went there three times. It was in the evening, after dinner, that I went there on Friday, before dark. . . I was not there when he signed the deed, I didn't know they were going to sign the deed."
The following evidence was introduced by the defendant: Albert B. Ingram, the attorney who drew the deed, testified: "I received a telephone call to come to this number on Market Street. . . As I walked in I was ushered into the bedroom of this man, Tony Lockwood, whom I had known in a way for several years, . . and he was lying over in the bed. Reverend Joseph H. Sanders was there. Someone had called me for him and said Reverend Sanders wanted me to come up to Tony Lockwood's house on Market Street. There was also a woman named Bessie — I forget her last name. Bessie said, `Mr. Ingram, Tony wants you to draw a deed to this house giving it to his sister-in-law, Norma Thomas.' I said `Where's Norma?' She said Norma was in San Diego, California. The old man was asleep at the time. I saw he was asleep, and I said, `Don't wake him until I get through with the deed and I will wake him and talk to him myself.' I then proceeded to draw this deed, and . . when I finished the deed I went over to the bed and I told Bessie, I says, `Wake Tony up, I want to read him this deed and see too if it is all right with him,' so she shook him and he opened his eyes and she said, `Tony, the lawyer is here,' and he looked over in my direction, and she was over next to the window, and I was on this side of the bed, and she said, `He wants to talk with you.' He looked at me and said, `All right, sir.' I said, `Tony, they have asked me to draw a deed to this house giving it to Norma Thomas, and I want to see if that is as you wish it, and I am going to read this deed to you, and if it is what you want I want you to say so, and if it ain't I want *Page 442 
you to say so, because it's a deed; the moment you touch this pen the house becomes Norma Thomas's and is no longer yours.' He shook his head in acquiescence, and I read it to him just like I read it to you now. . . After I read that deed to him, I said, `Now, Tony, do you understand that deed?' He said, `Yes, sir.' I said, `Is that what you want?' He said, `Yes, sir.' . . I let him touch the pen and . . I said, `Reverend Sanders, you saw him touch the pen, you sign as a witness and I will sign as notary public,' and he signed it as a witness and I signed it as a notary public. . . That is about all that took place. I had the deed recorded. I held the deed after it was recorded until Norma Thomas came in, and I delivered it to her according to her [his?] instructions. I have said Tony Lockwood was asleep when I went in the room. As to who gave me a description of the property if I had no paper there, I think Bessie was in there. . . He was asleep when I got there and gave me no instructions before drawing the deed; the instructions were given me by the woman Bessie, and after I drew the deed I waked him up. Tony gave me no instructions whatsoever. He, Tony, instructed me, after I drew it. I received no instructions whatsoever until after the deed was drawn. . . He wasn't unconscious, he was sleeping."
Joseph H. Sanders testified: "I am pastor of Springfield Baptist Church. . . Tony Lockwood was a member of my congregation, and I have known him between six and seven years. I visited his home every day from the time he took sick until he died. . . I think they carried him home sick just a little after the fourth Sunday in October. . . After that they reported he was sick and from that on I attended his bedside every day. During the time that I was attending him he was conscious of what was going on about him, absolutely. His mind was not affected in any way. He knew me every time I came in. I carried on a conversation with him the day before he died; that was on Saturday between two and three o'clock that I carried on the conversation with him. He asked me to have a service with him. . . I sang, I prayed, and I read the Scriptures to him. He said, `I enjoyed your service, I thank you so much.' . . That was between two and three o'clock on Saturday. I am the one that had you [Mr. Ingram] called to come up there. . . Both of us [witness and Mr. Ingram] went in at the same time. When we got on the inside, *Page 443 
Bessie James said to Tony Lockwood, `Lawyer Ingram is here to draw the deed.' He said, `All right.' Mr. Ingram sat down and began writing the deed. After he had finished writing the deed, he went over to the bed and said to Tony Lockwood, `Do you know me?' and he said, `No, I don't.'" This witness then gave substantially the same account of the signing and witnessing of the deed as testified to by Mr. Ingram. On cross-examination, he testified: "When Mr. Ingram and I went to Tony's room, Tony was awake. She (Bessie) called him and told him the lawyer was there to draw the deed. Tony didn't give any instructions to the lawyer about drawing the deed but said he wanted it drawn, but didn't tell what kind of deed he wanted drawn . . just told him he wanted a deed drawn to Norma B. Thomas. . . I mean to say that Tony Lockwood told Mr. Ingram, before he drew the deed, that he wanted him to draw the deed to Norma Thomas. . . When Mr. Ingram went in, he was told by Tony that he wanted him to draw the deed. I am positive about that. I can't be mistaken. . . He was not paralyzed; he wasn't even partially paralyzed. That occurred on Saturday afternoon between three and five o'clock."
Bessie James testified: "I wasn't at Tony Lockwood's when be died. I was there all day Saturday until ten o'clock that night. He knew what he was doing. He was perfectly all right. . . I am the one that sent for you (Mr. Ingram). I went there on the 2nd of November, 1942, and stayed until a few hours before he died on the morning of Monday, the 9th. I didn't send for you the first time. The first lawyer I called didn't come. . . I was calling for a lawyer at Tony's request. . . When you got up there, Reverend Sanders was in the room. . . When you came in, of course I explained to you that I was the one called you and that I was Bessie James, and you went over to the bed to talk with Tony, and you asked Tony if he knew you, and he said, `Well, I know your face but I can't call your name,' and then you told him who you was and said, `I had a call to come up here from Bessie James,' and he said, `Yes, I know about the call.' You said, `What you want done?' He said, `The wife that I had has left me for more than two years, and the property I now have I want to deed the property to my first wife's sister who is in California at the time, and I want to fix a deed to that effect.' He said, `I have already *Page 444 
deeded her a place before and I want her to have 1330 Market Street.' You said, `Tony, if you do this you won't have anything,' and he said, `I know what I am doing and I want it done that way,' is what he said to you. You drew the deed in the sick room where he was, on a table. . . After you drew the deed he said, `It is just what I wanted done.'" On cross-examination: "Tony told Mr. Ingram he wanted his place, 1330 Market Street, to [go] to his wife's sister, Norma Thomas, who was in California. He told Mr. Ingram that before he drew the deed. I gave him no information whatever. I met him in the hall and carried him in the room and Tony said, `I know your face,' and he began telling Mr. Ingram what he wanted done. . . Tony really did all the talking. Before he drew the deed he said he wanted it done."
Joseph H. Sanders, recalled, testified: "Tony Lockwood did make a statement to me as to why he wanted Norma Thomas to have his property. He said that during his old age and during the time, he said, she had advanced him money while she was in New York. He said that he had mortgaged his property to Mr. Hammond and Kennedy for $250, and she sent him the money to liquidate this mortgage, and that she had sent him money to keep his insurance intact while he was physically unable to carry out his work as he had been. He said that she was the only woman that had stood by him during the time he was failing in health."
Dr. W. W. White testified: "I am a medical doctor. As such I was called to attend Tony Lockwood in November, 1942, during his last illness. Tony Lockwood was sick ten or fourteen days. As to what was his mental and physical condition, when I was first called I made a close examination and he was suffering from kidney trouble and high-blood pressure, but it didn't seem to be very serious. I didn't go back to see him but told him if he got worse to let me know, and in about four or five days the nurse called me up and told me to come back, that he had gotten worse, and I noticed then that he began to weaken right smart, and I kept up with him every day, and I think he lived four or five days following that, and just the last day or two before he died he developed a slight cerebral hemorrhage, and the only way you could tell that he had a slight cerebral hemorrhage was by a slight impediment in his speech. He never did lose the power of motion in the slightest form. His mind was clear all the way through. I was *Page 445 
there every day to see him. . . I saw his mind was perfectly clear, I never did see any change in him, only weakening every day."
1. In Barlow v. Strange, 120 Ga. 1015
(48 S.E. 344), it was said, on authority of previous decisions, that, in order to avoid a contract on account of mental incapacity, there must be an entire loss of understanding. Also, in the more recent case of Higgins v. Trentham,186 Ga. 264 (2) (197 S.E. 862), this court approved, as stating a sound principle of law, an instruction that, "to establish incapacity in a grantor, he or she must have been shown to have been, at the time the contract was made, non compose mentis, which means entirely without understanding." See also Ison v.Geiger, 179 Ga. 798 (177 S.E. 596); Taylor v. Warren,175 Ga. 800 (166 S.E. 225). The final test as to mental capacity is necessarily confined to the condition of the grantor's mind at the time the deed was executed. Terry v.Buffington, 11 Ga. 337 (56 Am. D. 423); Hillyer v. Ellis,171 Ga. 300 (155 S.E. 180); Hill v. Deal, 185 Ga. 42
(193 S.E. 858); Scott v. Gibson, 194 Ga. 503 (22 S.E.2d 51). Under the foregoing rules as applied to this case, we are of the opinion that the evidence did not authorize a finding that the deed was invalid because of incapacity of the grantor, but demanded a finding that the deed was valid, so far as related to that issue.
The only witnesses who saw the grantor on the day when the deed was executed all testified to facts showing that his mind was clear, and that he was mentally and physically competent to execute such deed. The witnesses who testified to this effect were the minister who had visited the grantor every day during his illness, the nurse who attended him, the attorney who drew the deed, and his physician. It appeared that the physician was not present at the time the deed was executed, but saw the grantor during the same day.
Reference to the plaintiff's witnesses will include the plaintiff herself, she having testified in her own behalf. None of these witnesses saw the grantor later than Friday before his death on Sunday night or early Monday morning, the deed having been executed on Saturday. While they testified to their conclusions as to *Page 446 
his mental and physical condition at the times when they saw him, none of them testified to such a state of facts as to make their testimony inconsistent with that of the witnesses who saw the grantor at the time the deed was executed. The facts to which they testified fell within the class of circumstantial evidence, bearing only in an indirect manner upon the mental and physical condition of the grantor at the time the deed was executed, while the testimony of those who were present at its execution was in the nature of direct evidence, and therefore the following well-settled rule would seem to apply: "Direct and positive testimony, as distinguished from testimony circumstantial, opinionative, or actually negative in character, which is given by an unimpeached witness as to the existence of facts apparently within his own knowledge, which is not in itself incredible, impossible, or inherently improbable, and which is not contradicted directly or indirectly by proof of facts or circumstances that could be taken as incompatible with such testimony, can not be arbitrarily rejected by a jury or other trier of the facts upon the mere surmise that it perhaps might not be in accord with the truth." Lankford v. Holton,187 Ga. 94, 102 (200 S.E. 243).
Although, as we have stated, the issue as to contractual capacity is to be determined by the condition of the grantor's mind at the time the deed was executed, we fully recognize the rule that, in determining such an issue, it is permissible to receive and consider evidence as to the state of the grantor's mind for a reasonable period both before and after the transaction under investigation; nor do we say that witnesses might not testify to such a previous state of mind as would authorize a finding against contractual capacity at the time the deed was executed, despite evidence of witnesses who were present at the time and testified that the grantor did have such capacity. See, in this connection, Code, § 38-102; Terry v.Buffington, 11 Ga. 337 (2) (supra); Bridges v. Donalson,165 Ga. 228 (5) (140 S.E. 497); Ellis v. Britt, 181 Ga. 442
(182 S.E. 596); Renfroe v. Hamilton, 193 Ga. 194
(17 S.E.2d 709); 20 Am. Jur. 323, § 348; 28 Am. Jur. 697, § 59. The two rules are entirely consistent, and neither of them should be overlooked; the former referring to the ultimate fact, the latter to facts that are evidentiary only.
As just indicated, there was no material conflict between the *Page 447 
evidence by the witnesses for the plaintiff and that by the witnesses for the defendant. It seems that the witnesses for the plaintiff testified only as to their observations during their respective visits, which may have been only for short periods. If all that they said was true, it meant only that on several occasions during the week before the grantor's death he did not respond to the greetings or inquiries of these witnesses, and that from this fact and his appearance they considered him unconscious and in a dying condition. All of this could be true, and at the same time it could also reasonably be true, as testified by the minister and the nurse, that in their contacts with him he appeared to be rational; as testified by the minister, the nurse, and the attorney, that he was rational at the time of executing the deed; and as testified by the physician, that his mind was clear all the way through. As sick as the evidence shows this man was, he might not have felt like talking, and might have avoided doing so except as necessary to make his wants or desires known to those actually attending him. Nor, from the evidence as a whole, would it be unreasonable to conclude that, although at the times when the plaintiff's witnesses saw him he appeared to be unconscious and in a dying condition, he was yet physically and mentally capable of expressing himself to the defendant's witnesses at the times and in the manner stated by them, and competent to execute the deed in question at the time it was executed. It is the duty of jurors to reconcile the testimony of witnesses if it can be reasonably done, and there appears in this case no reason why all of the witnesses could not be telling the truth. It could not be concluded from the record that the witnesses for the plaintiff had better opportunity to know the real condition of the grantor, nor does any reason appear why they should have been considered more worthy of belief.
It is true that the witnesses for the defendant who were present at the signing of the deed were themselves in disagreement as to some matters — such as, whether the nurse or the minister called the attorney over the telephone; whether the information necessary for drawing the deed was given by the grantor himself, or whether he was asleep when the attorney arrived and was allowed to remain asleep until after the deed was drawn upon information given by another. But the contradictions as to these details did not furnish cause for impeachment, since they did not go to the question as to *Page 448 
mental capacity, which was sustained alike by the evidence of each of such witnesses.
It follows that the verdict was contrary to the evidence and without evidence to support it, so far as related to mental capacity of the grantor.
2. As to delivery of the deed, it appears that the attorney who drew it stated to the grantor that the moment the grantor touched the pen, the property became that of the grantee, and was no longer his; also that the attorney later delivered the deed to the grantee. This constituted a sufficient delivery under the law. In O'Neal v. Brown, 67 Ga. 707, this court held that: "The delivery of a deed consists in the transfer of possession and dominion and is complete at the moment when the deed is in the hands or power of the grantee with the consent of the grantor and with his intent that it should operate and enure as a muniment of title to the grantee. The presence of the latter is not necessary; it is sufficient that the deed goes out of the hands or control of the grantor with his intent that it should go to those of the grantee, and that it ultimately does so. Even though the deed reaches the grantee after the death of the grantor, having been previously left with a third person for the use of the grantee, it is a good delivery." And see Willingham
v. Smith, 151 Ga. 102, 104 (106 S.E. 117); Moseley v.Phoenix Mutual Life Ins. Co., 167 Ga. 491 (145 S.E. 877);Preston v. Ham, 156 Ga. 223 (1 c) (119 S.E. 658); FirstNational Bank of Cornelia v. Kelly, 190 Ga. 603, 604 (2) (10 S.E.2d 66); Cooper v. Littleton, 197 Ga. 381
(29 S.E.2d 606). Accordingly, the verdict for the plaintiff cannot be sustained upon the theory that the jury were authorized to find that the deed was never delivered.
3. As to mental capacity to make a deed, the judge charged the jury: "If one should have mind and reason sufficient to have a decided and rational desire as to what disposition he wishes to make of his property and to clearly understand and appreciate the nature and consequences of his act in making a deed of gift and he should make such a deed of conveyance of his property, having at the time such decided and rational desire to do so, and mind and reason to clearly understand that the nature of his act was to execute a deed to his property and that the consequences of his act was to divest it in another, he would be capable of making a *Page 449 
deed of gift under the laws of this State though he might not have had a greater mental capacity than that. If you believe from the evidence and the circumstances of the case that he did not have such mental capacity at the time he signed the deed, as I have defined to you, in that event, you would find for the plaintiff." The judge also stated the contentions of the parties, and charged on the preponderance of evidence. In special ground 4 of the motion for new trial, the movant contended in effect that the judge erred in not instructing the jury that the law presumed that the grantor was sane when making the deed, and that the burden of showing the contrary was upon the person attacking such deed. If such a charge on presumption and the burden of proof was desired, a written request should have been made.
Special ground 5 asserted that the verdict was contrary to the charge above quoted. This ground presented no question which was not raised by the general grounds, and need not be separately passed upon. Roberts v. Keeler, 111 Ga. 181 (6) (36 S.E. 617); Wight v. Schmidt, 111 Ga. 858 (36 S.E. 937); PalmerManufacturing Co. v. Drewry, 113 Ga. 366 (3) (38 S.E. 837);Jeffers v. State, 145 Ga. 74 (3) (88 S.E. 571).
Special ground 6 complained that the quoted excerpt was erroneous because of the clause referring to "decided and rational desire." There is no merit in this criticism. A charge in substantially the same language was approved in Smith v.McClure, 151 Ga. 484 (107 S.E. 330). See also Code, §§ 20-206, 113-202; DeNieff v. Howell, 138 Ga. 248 (5) (75 S.E. 202); Whitehead v. Malcolm, 161 Ga. 55 (129 S.E. 769);Talton v. Richardson, 163 Ga. 553 (136 S.E. 526).
4. In special ground 7 it was contended that the court erred in failing to charge the law relating to gifts causa mortis as stated in the Code, § 48-201. This section provides as follows: "A gift in contemplation of death (donatio causa mortis) must be made by a person during his last illness or in peril of death, must be intended to be absolute only in the event of death, and must be perfected by either actual or symbolical delivery. Such a gift, so evidenced, may be made of any personal property by parol and proved by one or more witnesses." Such a charge would not have been applicable to any issue in the present case. See generally, in this *Page 450 
connection: 28 C. J. p. 684, § 92; 38 C. J. S. p. 895, § 72; 24 Am. Jur. 732, § 4.
5. As shown in the first and second divisions of this opinion, the verdict for the plaintiffs was contrary to the evidence and without evidence to support it, and therefore contrary to law. For this reason alone, it was error to refuse a new trial.
Judgment reversed. All the Justices concur, except