PANTONE *et al. v.* PANTONE.

No. 16878.   JANUARY 9, 1950.

H. B. *Williams* and *Dykes & Dykes*, for plaintiff.

*Fort & Fort* and *R. L. LeSueur*, for defendant.

HAWKINS, Justice. (After stating the foregoing facts.) We cannot agree with the plaintiffs that the evidence in this case demands a verdict in their favor. While it is true that in *Lankford* v. *Holton*, 187 *Ga.* 94, 102 (200 S. E. 243), this court held: "Direct and positive testimony, as distinguished from testimony circumstantial, opinionative, or actually negative in character, which is given by an unimpeached witness as to the existence of a fact apparently within his own knowledge, which is not in itself incredible, impossible, or inherently improbable, *and which is not contradicted directly or by proof of facts or circumstances that could be taken as incompatible with such testimony,* can not be arbitrarily rejected by a jury or other trier of the facts upon the mere surmise that it perhaps might not be in accord with the truth"; and that, in *Thomas* v. *Lockwood*, 198 *Ga.* 437 (31 S. E. 2d, 791), it was held that, applying the ruling made in the *Lankford* case to the evidence in that case, it was insufficient to show incapacity on the part of the grantor, and that the verdict for the plaintiff canceling the deed was contrary to the evidence and without evidence to support it, the latter decision was not unanimous, Mr. Justice Atkinson dissenting on the ground that the evidence there made a question for the jury to determine. As we view the evidence in this case, the decisions there made are not controlling here. It is

true that neither of the witnesses named in the first and second grounds of the amended motion was impeached, and that their testimony, to the effect that Earnest Pantone at the time of the execution of the deed was sane, and was mentally capable of executing a valid contract, was direct and positive, and as to the existence of facts apparently within their knowledge, and that this testimony was not in itself incredible, impossible, or inherently improbable; yet it was contradicted by proof of facts and circumstances that could be taken as incompatible with such testimony, some of these facts and circumstances shown by the record being that this is the third appearance of litigation in this court between these parties concerning this land. *Pantone* v. *Pantone*, 202 *Ga.* 733 (44 S. E. 2d, 548); *Pantone* v. *Pantone*, 203 *Ga.* 347 (46 S. E. 2d, 498). It appears from the record in this case that there was much bitterness on the part of Earnest Pantone towards his brothers, the plaintiffs, at the time he entered the hospital on February 11, 1948, as the result of this previous litigation, which had not terminated at that time. The deed under which the plaintiffs claim the property in dispute was executed by Earnest Pantone on June 24, 1948, and recited "that the said party of the first part, for and in consideration of the sum of $1.00 and the further consideration that the original deed from the grantees, my brothers, to me dated July 23, 1940, recorded August 17, 1940, in Deed Book 24, page 425, was that I should retain the property for life and that it should be their property, I do hereby bargain, sell, alien and convey unto all the said grantees jointly, their heirs and assigns" the property in dispute—thus carrying a recitation in direct conflict with the contention which Earnest Pantone had successfully sustained in the previous litigation.

The record in this case contains testimony by the defendant, and by several witnesses introduced in her behalf, that, at various times shortly before and shortly after the execution of the deed in question, Earnest Pantone was not mentally capable of making a valid contract.

There was introduced in evidence the following excerpt from the report of an autopsy performed on Earnest Pantone after his death: "Since admission the patient's diabetes has been most difficult to control and has required daily regulation of both

diet and insulin therapy. His general condition has generally gone down hill and the disease in his lungs has continued to spread. On May 1, 1948, patient had a mild pulmonary hemorhage, and since that time has had frequent bleeding at irregular intervals; he continues a steady down-hill course; failing to respond to any type of treatment, and his condition gradually became toxic and his condition was frequently irrational and semi-stuporous. On July 16, 1948, he was declared incompetent by a psychiatric consultant. Patient gradually went into a coma and ceased to breathe at four fifty-two p. m., August 2, 1948."

There was also introduced a report dated July 17, 1948, made by Dr. John D. Campbell, to the Medical Director, Veterans Hospital, in part as follows "Psychiatric Examination of Earnest Pantone, 60, C2687383. Patient is a sixty-year-old ex-railroad worker lying quietly in bed and earnestly doing his best to co-operate in this examination. He speaks slowly and frequently, admits frankly he does not remember certain dates. He states he worked for the Seaboard Railway from 1909 to 1918 when he went into the army. Since 1918, however, he can give no accurate dates. For instance, he gives the month now as October and is unable to even guess the year. He does not know that Truman is President of the United States. On other subjects, the patient is confused and disoriented. At times he fabricates answers. He is unable to give a good discussion of his property and what he plans to do with it. He vaguely remembers doing some business recently with his brothers, but in doing this he says he slipped out of the hospital, went to Americus, did the business in a hotel in Americus, and slipped back into the hospital. Patient also states delusional ideas regarding procedure in the hospital; saying they ride the patients around in carts all night and bring them back in the mornings. He is utterly unable to perform even simple arithmetic problems. Diagnosis: Psychiatrically, Patient is psycotic. Psycosis should probably be classified as psycosis with organic disease. Mental illness is secondary to the disease, tuberculosis and probably also some arteriosclerosis. He is incompetent."

Dr. Campbell testified by deposition: His examination of Earnest Pantone was made on July 16, 1948, 22 days after the execution of the deed in question, and: "I don't think this illness

came on suddenly; as a matter of fact, this mental condition was considered to be an organic mental illness and secondary to a great extent to his physical diseases which were, as I was advised, diabetes, tuberculosis and some arteriosclerosis; his mental condition was based upon actual damaged brain tissue such as results from poor circulation like to [you] get in arteriosclerosis and any mental mental disease that is organic would have to be based on some actual brain damage; I would say that a mental disease of that nature is progressive in its nature; my interpretation of incompetency is a man who is unable to carry on his business or take responsibility as a citizen in a responsible manner; it would be difficult for me to conceive of him having been in that condition at least relatively speaking for less than two or three months; usually these organic mental diseases are accompanied by mental deterioration which goes on over a long period of time, months or even years; to have reached the stage of mental derangement in which I found him, I would think in my opinion that he could have had this condition as long as a year or more in a relative degree; from a disease of that nature a man deteriorates slowly; . . I don't think he was able to make an important business deal within a month from the time I examined him; . . I think it was very likely that his mental deterioration began several months and possibly a year or more than a year before the time I examined him, because I could not conceive of a person with this sort of mental deterioration getting that way in just a few weeks or even in two or three months; cerebral arterioscleros[is] works slowly in producing its mental deterioration; the diagnosis I made the day I examined him was psycosis with organic disease; that means that we attributed his mental illness to the three organic diseases he had, diabetes, tuberculosis, and cerebral arteriosclerosis."

There was also introduced in evidence excerpts from the doctors' progress notes with reference to Earnest Pantone while in the Veterans Hospital Forty-Eight, and from notes kept by nurses attending him, showing that during practically all the time after May 8, 1948, he was a very sick man; that he was "confused", "irrational", "disoriented", "incontinent", "semi-stuporous", or "talking at random" on the dates of May 11, 13, 15, 20, 21, 22, 26, June 3, 4, 5, 8, 9, 11, 12, 13, 14, 15, 16, 17, 19,

20, 23, 25, 26, 27, 28, 30, July 2, 8, 9, 16, 17, 21, 22, 23, and 25.

The issue as to contractual capacity is to be determined by the condition of the grantor's mind at the time the deed was executed (*Dicken* v. *Johnson*, 7 *Ga.* 484; *Terry* v. *Buffington*, 11 *Ga.* 337 (56 Am. D. 423); *Hillyer* v. *Ellis*, 171 *Ga.* 300, 155 S. E. 180; *Hill* v. *Deal*, 185 *Ga.* 42, 193 S. E. 858; *Scott* v. *Gibson*, 194 Ga. 503, 22 S. E. 2d, 51); but, in determining such an issue, it is permissible to receive and consider evidence as to the state of the grantor's mind for a reasonable period both before and after the transaction under investigation; and, under the testimony in this case, it was a question for the jury to determine under all the evidence, and there was sufficient evidence to support their finding against contractual capacity at the time the deed was executed, despite the evidence of the plaintiffs' witnesses who were present at the time and testified that the grantor did have such capacity. Code, § 38-102; *Terry* v. *Buffington*, 11 *Ga.* 337 (2) (supra); *Bridges* v. *Donalson*, 165 *Ga.* 228 (5) (140 S. E. 497); *Ellis* v. *Britt*, 181 *Ga.* 442 (182 S. E. 596); *Renfroe* v. *Hamilton*, 193 *Ga.* 194 (17 S. E. 2d, 709); *Thomas* v. *Lockwood*, 198 *Ga.* 437, 446 (31 S. E. 2d, 791).

While it is true that this court has held—in a number of cases involving the probate of a will, including *Hill* v. *Deal*, 185 *Ga.* 42 (193 S. E. 858), and the cases therein cited; *Fehn* v. *Shaw*, 199 *Ga.* 747, 754 (35 S. E. 2d, 253), *Hillyer* v. *Ellis*, 171 *Ga.* 300 (155 S. E. 180), *Scott* v. *Gibson*, 194 *Ga.* 503 (22 S. E. 2d, 51), *Orr* v. *Blalock*, 195 *Ga.* 863 (25 S. E. 2d, 668), and *Espy* v. *Preston*, 199 *Ga.* 608 (34 S. E. 2d, 705)—that the testimony there offered to show mental incapacity to execute a will was insufficient to overcome the positive testimony of subscribing witnesses, and in some instances of other witnesses, that at the time the will was executed, the testator had sufficient mental capacity, these cases are distinguishable upon their facts from the instant case; the effect of the rulings there made being that the evidence offered to show testamentary incapacity was insufficient for that purpose, and some of them being decisions by a divided court. Those cases, and other similar cases, are not controlling here. In *Whitfield* v. *Pitts*, 205 *Ga.* 259, 272 (53 S. E. 2d, 549), the statement is made in the opinion: "and testimony as to her mental capacity at other times can not break down the positive

testimony of the subscribing witnesses establishing testamentary capacity." As applied to the facts of that case the ruling there made was correct, for this court there held that the testimony offered for the purpose of showing testamentary incapacity was insufficient for that purpose. It is insisted here, however, that under this line of authorities proof of mental incapacity to execute a valid contract before and after the execution of the contract in question would not be sufficient to raise an issue to be passed upon by the jury, where the attesting witnesses who were present at the time testified positively as to mental capacity. We do not so construe the ruling made in *Whitfield* v. *Pitts*, supra, but if it should be given such construction, then we cannot follow it, for it was obiter dictum, and unnecessary to a decision of that case.

Under our procedure it is the province of the jury to pass upon issues of fact (*Carnegie* v. *Carnegie*, 206 *Ga.* 77, 55 S. E. 2d, 583), and to determine where the preponderance of evidence lies (Code, § 38-107); and where, as here, there is proof from which the jury would be authorized to find that both before and after the time of the execution of the contract in question, the maker was without contractual capacity, such evidence as to such a previous state of mind or subsequent state of mind raises an issue to be passed upon by the jury and may be sufficient to authorize the jury to find against contractual capacity at the time the contract was executed, despite evidence of witnesses who were present at the time of execution and testified that the maker did have such capacity. It is the province of the jury to determine which of the conflicting theories presented by the evidence they will accept, and not for this court to pass upon the weight and credit to be given to the testimony. *Potts* v. *House*, 6 *Ga.* 324 (50 Am. D. 329); *Gray* v. *Obear*, 59 *Ga.* 675 (3); *Frizzell* v. *Reed*, 77 *Ga.* 724 (5); *Hubbard* v. *Rutherford,* 148 *Ga.* 238 (96 S. E. 327); *Pennington* v. *Perry*, 156 *Ga.* 103 (9) (118 S. E. 710); *Cook* v. *Washington*, 166 *Ga.* 329, 358 (143 S. E. 409); *Manley* v. *Combs*, 197 *Ga.* 768 (1) (30 S. E. 2d, 485).

In view of the evidence in behalf of the defendant, which we have set out at some length, and under the rulings above announced, this court cannot hold that the trial court erred in overruling the motion for a new trial, for, if there be some evidence to support the verdict, the judgment of the trial court over-

ruling a motion for a new trial based on the ground that the verdict is contrary to the evidence will not be disturbed. *Stevens* v. *Middlebrooks*, 77 *Ga.* 81; *Thompson* v. *Fouts*, 203 *Ga.* 522 (47 S. E. 2d, 571).

· *Judgment affirmed. All the Justices concur.*