LEVENTHAL *v.* BAUMGARTNER *et al.*

No. 17239. OCTOBER 10, 1950. REHEARING DENIED NOVEMBER 15, 1950.

*Reese, Bennet & Gilbert,* for plaintiff.

*Gowen, Conyers & Dickey,* for defendant.

WYATT, J. The motion for new trial in this case is restricted to the general grounds. There was no evidence of undue influence. The sole question for our consideration is whether or not, under the evidence, the mental incapacity of Howard E. Ehrlicher to execute a will at the time the will was executed was established.

The propounder made out a prima facie case by the testimony of the three subscribing witnesses to the will, to the effect that the will was freely and voluntarily executed, and that the testator appeared to be of sound and disposing mind. One of the subscribing witnesses, who acted as scrivener in the drawing of the will, testified that he had known the deceased since he was a boy; that he had been a customer of the bank of which the witness was an officer, for a long number of years; that on the day the will was executed, the deceased gave to him all the facts necessary for the preparation of the will; and that, "in my

opinion, Mr. Ehrlicher's mental condition at the time he signed exhibit P-1 (the will) was entirely normal . . I would say that he had intelligence well above that of the average man at the time he signed the will . . there is no question in my mind that when he executed the will he was perfectly normal."

A prima facie case having thus been made out, the burden shifted to the caveators. The deceased was an old man who had retired. After retiring, he made his home with one of the caveators, a nephew. All of the other caveators are nieces and nephews. The propounder, who was the sole beneficiary under the will with the exception of a small sum left to a church, was also a niece of the deceased. It is argued that, since he left his property to a niece who had not befriended him, to the exclusion of the nephew who had befriended him and with whom he made his home after retiring, the disposition was an unreasonable one. Maybe so, and maybe not. We do not know what prompted the deceased in this, and he is not here to tell us. At any rate, that fact alone is not sufficient to set aside the will. See, *Penn* v. *Thurman*, 144 *Ga.* 67 (3) (86 S. E. 233).

The ascertainment of the mental condition of a deceased person when a will was executed generally presents a difficult question. The caveators, in their attempt to carry the burden of overcoming the prima facie case made out by the propounder, offered the testimony of one doctor. The will now under consideration was executed June 14, 1947. The doctor testified that he saw the deceased when he was admitted to the hospital on February 27, 1947. After stating that the deceased was suffering from internal hemorrhoids, chronic gall-bladder trouble, and general arteriosclerosis with hypertension, he testified: "It is a progressive disease and affects the patient mentally as well as physically . . the condition continued to grow progressively worse . . I think the condition affected both his mind and body. The people who came in daily contact with Mr. Ehrlicher would be in a much better position to judge the extent of his mental deterioration than a person who has seen him only once." Then on cross-examination the doctor testified: "I would not undertake to testify that, because one who had arteriosclerosis and who had it in April or May of 1947 and who still has it in April of 1948, was not normal mentally . . That

is one reason I stated that people closely associated with a person can tell more about his mental capacity, because they see him continuously."

It will be readily observed that the doctor would not attempt to testify that the deceased did not have sufficient mental ability to execute the will on the day of the execution.

A registered nurse testified in substance that she lived near the deceased, and that after his illness in the spring of 1947 up until his death in June, 1948, there was a decided change in his condition. She recited as facts upon which she based her opinion that the deceased would attempt to clip the lawn with scissors, would dig up the driveway and then bring more soil to put down, would set out grass and dig it up before it had a chance to grow; would jump from one subject to another in his conversations; and that he tried to graft a camellia by tying a bud to a limb. She then gave the opinion that, "after his illness he was a person of very low mentality, about that of a moron." *Black's Law Dictionary* defines a moron as: "One whose intellectual development proceeds normally up to about the eighth year of age, then is arrested and never exceeds that of a normal child of about 12 years." We are not prepared to say that an old man with the mentality of a normal child of 12 years of age would not have the mentality required to execute a will. In fact this court has rather strongly intimated that a normal child at the age of 12 to 14 years does have mental capacity sufficient to execute a will. See *Terry* v. *Buffington*, 11 *Ga.* 337, 345 (56 Am. D. 423).

A number of witnesses, neighbors of the deceased, testified that the deceased was not the same physically or mentally after his illness in the spring of 1947, which was a date prior to the execution of the will. His condition was described by the witnesses as "having the mental capacity of a child of 10"; as "not having any mind"; as "not having the mental capacity to sell a piece of property or dispose of anything he owned, or to buy anything." These witnesses were non-expert witnesses, and the facts upon which they based their opinions were: that the deceased's memory was bad; that he would not recognize immediately people whom he had known for a long time; that he would jump from one subject to another in his conversation; that

he got lost about 400 yards from his home, and other occurrences of like nature. These opinions are, of course, no stronger than the facts upon which they are based. It is common knowledge that all of those things are rather common occurrences with old people, especially when their health is not good. The rule is: "if the testator has sufficient intellect to enable him to have a decided and rational desire as to the disposition of his property, this will suffice." *Slaughter* v. *Heath,* 127 *Ga.* 747 (57 S. E. 69, 27 L.R.A. (N.S.) 1). The facts upon which the witnesses in the instant case based their opinions were not alone sufficient to show that the deceased did not have this degree of mentality, but on the contrary described what is the condition of many old people who are suffering from the ravages of disease. The mere fact that a person is shown to have a weak intellect on account of disease is not sufficient to take from him the sacred right of disposing of his property by will in such manner as he may desire.

None of the witnesses offered by the caveators saw the deceased on the day the will was executed. The range of time was about two weeks before the execution of the will and a few days thereafter, the exact time not appearing. Many decisions of this court, not necessary here to be cited, deal with the question as to the sufficiency of evidence concerning mental capacity at the time the will is executed, when the evidence deals with the condition of the deceased shortly before and shortly after the execution of the will, where there is no evidence to contradict the evidence of the subscribing witnesses as to the mental condition on the day the will is executed. The true rule seems to be: if there is no evidence to the effect that the deceased had normal periods, and it is shown that his condition was one that grew progressively worse, evidence of the mental capacity of the deceased before and after the execution of the will may support a verdict finding mental incapacity at the time the will was executed, notwithstanding the testimony of the subscribing witnesses to the contrary. That, however, is not the situation in the instant case. A witness, Mr. Grant, manager of the Veteran's Service Office in Brunswick, who assisted in getting deceased into the Marine Hospital, and who was a neighbor of the deceased, was placed on the stand by the caveators. After testify-

ing that the deceased was much weaker physically and mentally after his illness, and reciting facts regarding his poor memory and jumpy conversation, the witness said: "At times he was normal . . ." This was the only positive testimony concerning whether or not the deceased had normal periods. The only positive evidence in this case as to the condition of the deceased on the day the will was executed, and several days before and after, was that of the subscribing witnesses to the effect that he was perfectly normal mentally at the time the will was executed.

It might be true that all the facts testified to by the witnesses for the caveator are true, and yet, under the uncontradicted evidence of the subscribing witnesses, the old man was perfectly normal on the day the will was executed. *Morgan* v. *Bell*, 189 *Ga.* 432 (5 S. E. 2d, 897), and *May* v. *May*, 175 *Ga.* 693 (165 S. E. 617), cited and relied upon by the defendants in error, both differ on their facts from the instant case. In the *Morgan* case, the doctor testified: "I would not think she had mind enough to understand the meaning of the paper (the will)." In the *May* case, there was no evidence to the effect that the deceased had normal periods.

It follows from what has been said above, the evidence was not sufficient to carry the burden placed by the law upon the caveators. It was therefore error to overrule the motion for new trial.

*Judgment reversed. All the Justices concur, except Duckworth, C.J., Head and Hawkins, J.J., who dissent.*

HAWKINS, Justice, dissenting. I dissent on authority of the rulings made in *Brock* v. *State*, 206 *Ga.* 397 (57 S. E. 2d, 279); *Pantone* v. *Pantone*, 206 *Ga.* 305 (57 S. E. 2d, 77); *Jarrard* v. *State*, 206 *Ga.* 112 (55 S. E. 2d, 706); and I am authorized to say that Duckworth, Chief Justice, and Head, Justice, concur in this dissent.