## IN RE ESTATE OF WALSH
## KURKA, et al., Appellants v. FIRST NAT'L BANK OF THE BLACK HILLS, RAPID CITY, et al., Respondents

(232 N.W.2d 850)

(File No. 11503. Opinion filed September 9, 1975)

Robert C. Bakewell, Jr., Custer, for appellants.

Hobart H. Gates, Custer, Allen G. Wilson, Hot Springs, for respondents.

WINANS, Justice.

Helen A. Walsh, a spinster, died at Hot Springs, South Dakota, on March 13, 1974, at the age of 82, having lived a frugal, rugged and rather rustic life alone. She had done most of her own farming and cattle raising near Custer until a very few years before her passing. She left no immediate family and her closest relatives were nieces, nephews, grandnieces and grand-nephews of the half-blood, none of them residents of this state. Previous to her death, upon the sale of her real estate by the appointed guardian, she had assets of roughly a quarter of a million dollars, at least this was her worth before the deduction of counsel fees in the amount of more than $48,000 for litigation to recover her lands and remove some liens. Her distant relatives now come before this court and ask us to reverse the decision of the lower court admitting to probate her last will and testament, dated May 20, 1969. They allege that she was not of sound and disposing mind at the time of the document's execution and that she did not publish it as her last will and testament to the witnesses in a manner conforming to SDCL 29-2-6. On appeal they have also belatedly argued the presence of undue influence. For the reasons which we here set forth we affirm the decision of the lower court.

Decedent Walsh was already advanced in years when she began an action to recover her real property and to cancel liens against her from transactions she had entered into in the early part of 1969, the year she also executed the document here challenged. That action ultimately reached this court where we

determined that she had been the victim of fraud and undue influence. *Walsh v. Shoulders*, 1973, 87 S.D. 270, 206 N.W.2d 60. At the time of that decision ample evidence had been introduced at trial that during the months in question (essentially December 1968 through mid-March of 1969) Helen Walsh was physically debilitated from a severe attack of the flu and had been several times confined by this illness to hospitals and a nursing home. There was also evidence that she was suffering from the apparently early stages of arteriosclerosis or chronic brain syndrome. There is no question that during that period she was weak and confused. This Court observed that many months later the record of her testimony at trial in the Shoulders case showed that this confusion or mental impairment existed to some degree. We also note, however, that Miss Walsh was able even after that trial to return to her home, continue her business affairs and feed and raise her cattle. It was not until March of 1972 that a legal guardian was appointed for her estate and April of 1972 that a legal guardian was appointed for her person. Appellants, contestants of the will, ask us to conclude that because of her condition in early 1969 and at a later period Helen Walsh was obviously incompetent to execute a will during an intervening period.

A hearing on the petition for probate was held at Custer, South Dakota, on April 29, 1974. Five people testified for the Proponents including Miss Walsh's attorney, his secretary, the two witnesses to the will and the assistant cashier of a Custer bank with which Miss Walsh had done business. Two individuals testified for the Contestants, one a physician who did not have Decedent as a patient until 1971 and the other a friend who had no contact with her at all during the month of May, 1969. Among evidence introduced by Contestants was the transcript of the Shoulders trial held at Rapid City on December 9, 1970. There her medical doctor testified relative to her condition in part as follows:

CROSS EXAMINATION BY MR. BOTTUM OF DR. CHARLES ROPER:

"Q So that on the 21st you felt that the condition for which she had been hospitalized, she had recovered

sufficiently from that so that you were justified in permitting her to leave the hospital?

A Right.

Q And that's the only thing for which you were treating her, is that not correct, Doctor?

A Yes.

Q And she got well?

A She got well enough to leave the hospital, yes.

Q That is, she had the flu?

A Right.

Q And when she left on the 21st of January [1969], I take it that that condition had—she had gotten well so that she no longer had the flu?

A This is correct.

Q And you haven't seen her since, that is, for the purpose of medical examination or treatment or anything else?

A No.

Q So if I were to ask you what her condition was in March of 1969, you wouldn't be able to tell us from what you observed?

A I couldn't tell you.

\*　\*　\*　\*　\*　\*

Q I'm talking about sometime in March of '69 now, you wouldn't know from your observation of her whether she was capable of carrying on business transactions or not, isn't that about right?

A That's right."

In other words, though Dr. Roper had previously diagnosed chronic brain syndrome and the flu, he could not say with any certainty that she was incapable of transacting business in March of 1969, two months or so after the diagnosis and two months before the will was executed. Concerning her condition in January of that year Dr. Roper had testified: "I don't think the woman was truly demented, but * * she had been ill for roughly three weeks, * * * she had not been eating * * * she was so weakened that * * * she was even unable to get out of bed * *." It should be noted here that it was never the decision of this Court that Helen Walsh at the time of the Shoulders transactions was *non compos mentis*, but only that her condition was of such a nature during the first quarter of 1969 as to make her a fit subject for fraud and undue influence. If mere confusion were tantamount to insanity few would be fit to execute any legal documents.

The court below was confronted with the task of determining whether or not Proponents of the will of Helen A. Walsh had demonstrated that she had requisite testamentary capacity on May 20, 1969. It had the benefit of five witnesses, four of whom dealt with her on that day, supporting the Proponents' case. On the other side it had the testimony of two persons who had no dealings with her at all during the month of May. It also had the record from the Shoulders trial and appeal which did not deal with Decedent's conduct or condition during the month of May and the record of guardianship proceedings some three years subsequent. In the case of *In Re Estate of Hobelsberger,* 1970, 85 S.D. 282, 181 N.W.2d 455, this Court held that the finding of the trial court that an 80-year-old testator suffering from intermittent cerebral insufficiency was of sound and disposing mind and memory, competent and had testamentary capacity was not clearly erroneous. We have long held that.

> "A party may be so diseased mentally as not to be of sound mind, and yet may possess what the law terms 'a disposing mind.' Nothing more is required than that the party must be capable of acting rationally in the ordinary affairs of life, so that he may comprehend what disposition he may wish to make of his property, and be able to select the subjects of his bounty. [citation

omitted] If he knew and comprehended what he was about when he executed the instrument, he had sufficient testamentary capacity." *In Re Corson's Estate,* 1912, 29 S.D. 14, 135 N.W. 666.

*Leventhal v. Baumgartner,* 1950, 207 Ga. 412, 61 S.E.2d 810, was a case in which a physician had testified concerning the testator that he suffered from, *inter alia,* general arteriosclerosis with hypertension. He then said: " 'It is a progressive disease and affects the patient mentally as well as physically * * * the condition continued to grow progressively worse * * * I think the condition affected both his mind and body. The people who came in daily contact with [testator] would be in a much better position to judge the extent of his mental deterioration than a person who has seen him only once.' * * * I would not undertake to testify that, because one who had arteriosclerosis and who had it in April or May of 1947 and who still has it in April of 1948, was not normal mentally * *." The Court in that case remarked that "[t]he mere fact that a person is shown to have a weak intellect on account of disease is not sufficient to take from him the sacred right of disposing of his property by will in such manner as he may desire." With that sentiment we are in full accord.

*In Re Estate of O'Loughlin,* 1971, 50 Wis.2d 143, 183 N.W.2d 133, dealt with a testator who suffered from Parkinson's disease caused by arteriosclerosis at the time he executed his will. The Wisconsin court said: "In a somewhat similar case, this court found a testator suffering from advanced arteriosclerosis competent to make a will on the date of its execution. [citations omitted] The testator needs only to have testamentary capacity at the time of executing the will; it is not necessary he is or remains competent for any great length of time before or after the execution."

Having reviewed the entire record of proceedings in the court below we cannot say that the trial court was clearly erroneous in finding that Helen A. Walsh was possessed of sound mind and testamentary capacity when she signed her last will and testament on May 20, 1969.

Appellants also argue that the execution of the Decedent's will did not conform to SDCL 29-2-6. It is uncontroverted that on May 20, 1969, Helen A. Walsh went to the office of Hobart Gates, a former county judge accustomed to probate procedure, and requested him to draft a new will for her. She specified that she wanted to exclude any of her relatives as she also had done in a will executed in 1955. She left her entire estate to Kenneth Trask of Custer who had befriended her. In the event of his death the estate would go to his wife, Gertrude Trask. The will was typed by Mrs. Ann Gates who acts as secretary to her husband. Mr. Gates and Miss Walsh then went to the nearby Custer County Courthouse to the County Auditor's office and contacted Jessie McFayden, Clerk Auditor, and Dorothy Duncan Monsen, County Auditor. Mr. Gates told them in the presence of Decedent that Miss Walsh had her will with her and was going to sign it and wished them to sign as witnesses. Mr. Gates testified that to this Miss Walsh nodded her assent. Both of the witnesses to the will testified that at this point Miss Walsh smiled. SDCL 29-2-6 requires that:

> "Every will, other than a nuncupative will, must be in writing, and every will, other than an olographic will and a nuncupative will, must be executed and attested as follows:

> *   *   *   *   *   *

> (3) The testator must, at the time of subscribing or acknowledging the same, declare to the attesting witnesses that the instrument is his will;

> (4) There must be two attesting witnesses, each of whom must sign his name as a witness at the end of the will, at the testator's request and in his presence;".

This Court has already dealt with this matter in *In Re Ryan's Estate*, 1952, 74 S.D. 359, 53 N.W.2d 11. There we said:

> "In accord with the great weight of authority, this court has held that to satisfy the foregoing provisions [the statute in question] it is not required that a testator

> expressly declare to the attesting witnesses that the instrument he is subscribing is his will, or that he expressly request them to sign as witnesses. It is sufficient if, at the time of the execution, he make it manifest to them by either word, sign, or conduct that the instrument is his will and he desires them to sign as attesting witnesses."

Whether Helen Walsh nodded, smiled, did both or did neither we think that she fulfilled our law's requirements by her conduct. She was present while her attorney told the two witnesses what would transpire. She followed his declaration by signing the document and she apparently watched the witnesses do the same. She and Mr. Gates then took the will and delivered it to the Clerk of Court's office for safekeeping. Although the manner of this will's execution may border the limits announced in our earlier cases, see *In Re Ryan's Estate, supra,* and cases cited therein, and although the laxness of Decedent's counsel to insure that the will was executed with strict adherence to statutory formalities greatly disturbs us, we must conclude that Decedent's conduct before, during, and after the execution of the will, when viewed in the light of her attorney's direct statements to the soon-to-be attesting witnesses, indicates she was aware that the instrument she was signing was her will and that she wanted the witnesses to attest the document. She thus satisfied the requirements of SDCL 29-2-6. For us to conclude otherwise would put in jeopardy one's right to dispose of property by will as one sees fit within certain bounds fixed by statute and it would severely strain the credibility of our judicial system.

might have been again subjected to undue influence in leaving her estate to Kenneth Trask as she had previously been in the whole Shoulders affair. Contestants, however, have introduced this issue for the first time only in their proposed findings of fact and conclusions of law and in their brief to the trial court after the hearing and no substantial evidence was offered to support the charge. Even if this issue be considered as having been litigated in the probate court and properly before us for review, we find nothing in our review of the record to warrant a reversal of the trial court's ruling on this issue. On all issues the

Proponents have met their burden of proof and we find the decision of the trial court was not clearly erroneous in any respect.

Affirmed.

All the Justices concur.